[No. B188868. Second Dist., Div. Three. Jan. 23, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL EARL BYRON, JR., Defendant and Appellant.

**COUNSEL**

Jan B. Norman, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews, Adrian N. Tigmo and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KLEIN, P. J.**—Defendant and appellant, Michael Earl Byron, Jr., appeals the judgment entered following his conviction, by jury trial, for domestic violence with a great bodily injury enhancement (Pen. Code, §§ 273.5, 12022.7).[1] Sentenced to state prison for six years, Byron claims there was trial error.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established the following.

    1. *Prosecution evidence.*

On July 27, 2003, Christine Sowers called 911 and told the operator she had just been assaulted by her boyfriend, defendant Mike Byron. She said Byron came over to her apartment and demanded money. A fight ensued, during which Byron bit her cheek, tried to choke her, and punched her in the back. A tape recording of Sowers's 911 call was played for the jury:

"[Emergency Operator] 911. State your emergency.

"[Sowers] Hi. I—I—I can't breathe right now. My boyfriend . . . came . . . here and was demanding money from me and he punched me in the back really, really hard and I—I can't breathe. I don't know if he . . . punctured my lung . . . but I can't breathe, and it's hard for me to breathe."

"[Emergency Operator] Any other injuries besides the back?

"[Sowers] No, no. Just he bit my—my cheek. I didn't—I can't—I can't feel * * *

"[Emergency Operator] Okay. Did he—did he hit you with any weapons?

"[Sowers] No. Just he tried to choke me with his hands."

Deputy Sheriff Robert Wilkinson went to Sowers's apartment in response to the 911 call. When he arrived, an ambulance and paramedics were already

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

present and Sowers was on a gurney waiting to be taken to the hospital. Wilkinson testified he spoke to Sowers "briefly just to get a brief description of the suspect. And so we can put out a crime broadcast to have other units search the area for him." The following colloquy occurred:

"Q. And what was her condition when you spoke to her at that time?

"A. She was complaining of extreme pain to her back, and she was crying. She was very hysterical.

"Q. And what description did she give you of the person who had done this to her?

"A. She . . . named the suspect as Michael Byron. Said it was a boyfriend or previous boyfriend of hers. She described him as five-eight, 160-odd pounds. Said that he drives a black Camaro.

"Q. And did you relay that so that a crime broadcast was initiated?

"A. Yes, we did. I placed the crime broadcast over the radio to the other units."

Wilkinson subsequently had a second conversation with Sowers at the hospital. She told him she and Byron had been living together, but they had broken up two weeks before and he moved out. That day he showed up, banged on her door and demanded money. She refused and told him to leave. He kicked the door in and attacked her. He put his hands around her throat, choked her and said, "I could kill you right now." When he released the pressure, she spat in his face and he bit her cheek. Sowers grabbed her purse and sat on the floor, trying to keep the purse away from Byron. He punched her in the back and left the apartment. Sowers could not catch her breath. She sat on the floor for 10 minutes before calling 911, afraid her ribs were broken.

Michael Bernards is Sowers's brother. He testified she called him on the afternoon of July 27, 2003, to say Byron had beaten her up and that she was in the hospital. Michael and his brother Jeff went to Sowers's apartment. Her front door appeared to have been kicked in and they had to nail it back into the doorframe.

Douglas Nale, a deputy sheriff, testified that on August 9, 2003, he discovered Byron's empty car in a parking lot. He then saw Sowers pull up in a Jeep and Byron get out of the passenger seat. After Byron got into his own car and started off, Nale stopped him. Sowers pleaded with Nale not to arrest Byron, saying she did not want to press charges.

On August 11, 2003, Sowers gave police a videotaped statement. She said Byron had not damaged her door on the day of the assault. She falsely told the responding officers he had broken in because she did not want them to think she was stupid for voluntarily opening the door. Actually, Byron had damaged the front door on an earlier occasion. When Byron came over on the day of the assault, he wanted $50 for groceries. Sowers refused, Byron got upset, and they started fighting. He choked her. Sowers grabbed her purse and lay down on the kitchen floor in a fetal position. While she was on the floor, Byron "punched [her] as hard as he could." She called 911 because she was having trouble breathing. At the hospital, she was treated for five cracked ribs and a punctured lung. Byron had been violent with her in the past, taking her by the throat and pushing her up against a wall. There had also been several fights during which they exchanged punches.

On September 4, 2003, Sowers testified at Byron's preliminary hearing. Her testimony was read to the jury at Byron's trial. Sowers testified Byron was her ex-boyfriend. On July 27, 2003, he came to her apartment and asked her for grocery money. When she refused, he got very upset. Sowers was lying on a couch in the living room. Byron came over and sat on top of her. They yelled at each other. Byron put his hands around her throat and choked her. He said he wanted to kill her. After they fought for five or 10 minutes, he let go of her neck. Then he bit her on the cheek. When Byron got off her, Sowers ran into her bedroom and locked the door. After a while, she went into the kitchen. Byron was there, crying. Sowers grabbed her purse from a chair to prevent him from taking her money. They struggled. Sowers "leaned over like in a fetal position on the ground of the kitchen," and Byron punched her once in the ribs. Sowers testified: "I couldn't breathe. I was scared. I . . . had never felt like that before. I couldn't breathe."

"Q. What did the defendant do at that time?

"A. He got his cell phone and keys and left.

"Q. Did you call 911?

"A. Not right away because I didn't know what was wrong. I was hoping . . . it would go away, so I tried to lay down, and it wouldn't go away, and that is when I called them about 15 minutes later."

Sowers spent four days in the hospital where she was treated for "[f]ive cracked ribs and a punctured lung."

Byron did not present any evidence at trial.

2. *Proceedings leading to this appeal.*

This is the second appeal to be brought in this case.

Because Byron absconded on February 19, 2004, the third day of his trial, he was not present when, later that day, he was convicted and sentenced. Byron was subsequently picked up on a bench warrant. He appeared at a hearing on April 21, 2004, during which the trial court invited defense counsel to make a motion to vacate the judgment so Byron could file a new trial motion challenging the admission of Sowers's hearsay statements under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], which had been decided on March 8, 2004.

On May 12, 2004, the trial court granted Byron's motion to vacate the judgment. The People appealed and, on March 28, 2005, this court reversed and remanded with directions for the trial court to reinstate the judgment and sentence. On June 9, 2005, the trial court reinstated the original judgment and sentence. On February 26, 2006, pursuant to an order from this court, Byron filed a belated notice of appeal from the reinstated judgment.

## CONTENTIONS

1. The People contend Byron's appeal must be dismissed as untimely.

2. Byron contends his conviction must be reversed because Sowers's hearsay statements, accusing him of assaulting her, were improperly admitted.

## DISCUSSION

1. *We will construe Byron's untimely appeal as a habeas corpus petition.*

The Attorney General contends, and in his supplemental letter brief Byron concedes, that the notice of appeal was untimely. Byron asks, however, that we treat his untimely notice of appeal as a habeas corpus petition. For reasons of judicial economy, we will do so.

An appeal in a criminal case is taken by filing a notice of appeal within 60 days after the rendition of judgment. (Cal. Rules of Court, rule 8.308(a).) "[T]he sole required procedural step of filing a notice of appeal is critical to

rendering the appeal operative following a judgment of conviction. In general, a timely notice of appeal is ' "essential to appellate jurisdiction." [Citation.] It largely divests the superior court of jurisdiction and vests it in the Court of Appeal. [Citation.] An untimely notice of appeal is "wholly ineffectual: The delay cannot be waived, it cannot be cured by nunc pro tunc order, and the appellate court has no power to give relief, but must dismiss the appeal on motion of a party or on its own motion." [Citation.]' " (*In re Chavez* (2003) 30 Cal.4th 643, 650 [134 Cal.Rptr.2d 54, 68 P.3d 347].)

The original judgment in this case was rendered on February 19, 2004. We agree with the parties that Byron's notice of appeal was untimely because it had not been filed by April 19, 2004, i.e., within 60 days of the judgment.[2]

It is true that, generally, "the right to appeal a previously vacated judgment cannot be curtailed or cut off retroactively by reinstatement of the judgment as a result of either a reversal on appeal or an order by the superior court." (*Matera v. McLeod* (2006) 145 Cal.App.4th 44, 58 [51 Cal.Rptr.3d 331]; see also *Avery v. Associated Seed Growers, Inc.* (1963) 211 Cal.App.2d 613, 632 [27 Cal.Rptr. 625] [citing "the general principle that where the right of appeal is suspended, an appeal may be taken within the period provided by law, after such right is restored"].) But that is because, in the usual situation, the party seeking to appeal had been legally prevented from appealing when the now reinstated judgment was originally rendered. (See *Matera v. McLeod, supra,* 145 Cal.App.4th at pp. 57–58 [where trial court granted defendant relief from default judgment, but later reversed itself and effectively reinstated default judgment after appeal time had run, defendant's time to appeal properly ran from reinstatement of judgment]; *Avery v. Associated Seed Growers, Inc., supra,* 211 Cal.App.2d at pp. 631–632 [where trial court vacated plaintiff's judgment and entered new judgment for defendant, but Court of Appeal then reversed, defendant's time to appeal properly ran from reentry of original judgment after remand].)

In this case, however, Byron was not legally prevented from appealing the originally rendered judgment. That is because the trial court vacated Byron's judgment of conviction *after* the time to appeal had already expired. (See, e.g., *Tuck v. Tuck* (1966) 245 Cal.App.2d 260, 264 [53 Cal.Rptr. 872] [where trial court amended judgment *after* time to appeal had expired, but appellate court reversed and reinstated original judgment, party who failed to timely appeal original judgment could not now challenge it].) Byron faced no legal obstacle to filing a timely notice of appeal and, therefore, the rule against retroactively curtailing a right to appeal does not come into play.

---

[2] Although Byron initially claimed his notice of appeal was timely, in his supplemental letter brief he concedes it was untimely.

Nevertheless, we conclude it would be in the interests of judicial economy for us to treat Byron's untimely appeal as a petition for writ of habeas corpus. Byron claims defense counsel was ineffective for not filing a notice of appeal once *Crawford* was decided because the admissibility of Sowers's hearsay statements was obviously a central issue in the case. (See *Roe v. Flores-Ortega* (2000) 528 U.S. 470 [145 L.Ed.2d 985, 120 S.Ct. 1029] [6th Amend. right to effective assistance of counsel would encompass claim counsel had been ineffective for failing to file notice of appeal if defendant showed counsel's performance had been deficient and defendant had been thereby prejudiced]; *In re Pritchett* (1994) 26 Cal.App.4th 1754, 1756 [33 Cal.Rptr.2d 296] [granting defendant's habeas corpus claim that counsel was ineffective for filing untimely notice of appeal].)

The Attorney General argues we should not treat Byron's untimely appeal as a habeas corpus petition because, by absconding, Byron waived his right to appeal and, therefore, he cannot show there was any resulting prejudice: "As the United States Supreme Court has recognized [in *Ortega-Rodriguez v. United States* (1993) 507 U.S. 234 [122 L.Ed.2d 581, 113 S.Ct. 1199]], a defendant's flight under these circumstances may be viewed as a waiver or abandonment of a statutory right to appeal. . . . Defense counsel should not be deemed ineffective for declining to file a notice of appeal on behalf of a client who, by absenting himself from the proceedings, has defaulted his appeal."

■ But the Attorney General is conflating two different situations. *Ortega-Rodriguez* did not involve the so-called fugitive dismissal rule, which automatically dismisses the pending appeal of a defendant who became a fugitive *after* filing the notice of appeal. Rather, *Ortega-Rodriguez* involved a defendant who, like Byron, absconded and was then captured *before* the notice of appeal was filed: "[W]e conclude that while dismissal of an appeal pending while the defendant is a fugitive may serve substantial interests, the same interests do not support a rule of dismissal for all appeals filed by former fugitives, returned to custody before invocation of the appellate system. Absent some connection between a defendant's fugitive status and his appeal, as provided when a defendant is at large during 'the ongoing appellate process,' [citation], the justifications advanced for dismissal of fugitives' pending appeals generally will not apply." (*Ortega-Rodriguez v. United States, supra*, 507 U.S. at p. 249; see also *People v. Kang* (2003) 107 Cal.App.4th 43, 51 [131 Cal.Rptr.2d 447] ["The holding of *Ortega-Rodriguez* is that appellate sanctions are not automatic and cannot be imposed on a fugitive who escapes before the appellate process commences except in the unusual situation where a meaningful appeal is impossible."].) The Attorney General does not argue a meaningful appeal would be impossible here.

Given the possibility Byron might be able to make out an ineffective assistance of counsel claim based on defense counsel's failure to file a timely notice of appeal,[3] we will treat his purported appeal as a habeas corpus petition and reach his contention that Sowers's hearsay statements were improperly admitted under *Crawford.*

2. *Any* Crawford *error was harmless.*

Byron contends his conviction must be reversed because the only evidence showing he was Sowers's assailant consisted of her improperly admitted hearsay statements. He argues Sowers's hearsay statements should have been excluded either because they were testimonial under *Crawford v. Washington, supra,* 541 U.S. 36, or because the prosecution failed to show she was an unavailable witness. This claim is meritless.

a. Crawford*'s confrontation clause principles.*

"In *Crawford v. Washington*[*, supra,*] 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] . . . , the United States Supreme Court announced a new standard for determining when the confrontation clause of the Sixth Amendment prohibits the use of hearsay evidence—i.e., an out-of-court statement offered for its truth—against a criminal defendant. *Crawford* held that this clause protects an accused against hearsay uttered by one who spoke as a ' "witness[ ]" ' ' "bear[ing] testimony" ' [citation] if the declarant neither takes the stand at trial nor was otherwise available for cross-examination by the accused." (*People v. Cage* (2007) 40 Cal.4th 965, 969 [56 Cal.Rptr.3d 789, 155 P.3d 205].)

As we said in *People v. Cervantes* (2004) 118 Cal.App.4th 162, 172 [12 Cal.Rptr.3d 774], "[P]rior to *Crawford,* the admissibility of an out of court statement by an unavailable witness as substantive evidence against a criminal defendant turned on whether the statement contained 'particularized

---

[3] The Attorney General argues Byron will not be able to show defense counsel's performance was deficient: "[I]t is undisputed that Byron fled during trial proceedings and was not apprehended for a substantial period of time. In the interim, his trial had concluded, he had been sentenced, and his statutory right to file a notice of appeal had expired. In asserting that defense counsel acted incompetently in failing to 'consult' about the decision whether to file a notice of appeal, Byron ignores the apparent fact that he made himself unavailable for any consultation with his lawyer." Byron, on the other hand, argues defense counsel could have filed the notice of appeal despite the fact he fled, or even after he was apprehended but before the time to appeal lapsed. Because the trial record does not definitively indicate when Byron was apprehended, he conceivably could make out a claim counsel was ineffective for failing to appeal.

guarantees of trustworthiness' such that adversarial testing would add little to its reliability. [¶] *Crawford* replaced this test with a new focus on the 'testimonial or nontestimonial nature' of the out-of-court statement. *Crawford* held that '[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.' [Citation.] Thus, *out-of-court testimonial statements are admissible only when the witness is unavailable and there has been a prior opportunity for cross-examination of that witness.*" (Some italics added.)

■ In *Davis v. Washington* (2006) 547 U.S. 813, 822 [165 L.Ed.2d 224, 126 S.Ct. 2266], the Supreme Court commented on its evolving notion of testimonial hearsay in the confrontation clause context: "Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (Fn. omitted.)

In *People v. Cage, supra,* 40 Cal.4th 965, our Supreme Court said: "We derive several basic principles from *Davis.* First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Id.* at p. 984, fns. omitted.)

b.  *Proceedings below.*

In a pretrial motion, the prosecution asked that Sowers's statements be admitted as hearsay exceptions under Evidence Code sections 1370 (narration of infliction of physical injury)[4] and 1240 (excited utterance).[5] The motion alleged Sowers was unavailable as a witness because she was, in the words of Evidence Code section 240, subdivision (a)(5), "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

Following the testimony of the prosecutor's investigator about his unsuccessful efforts to locate Sowers, the prosecutor asked the trial court to admit four of Sowers's hearsay statements: her 911 emergency call; her statements to Officer Wilkinson at the hospital on the day of the incident; her videotaped interview with a police detective two weeks later; and her testimony at the preliminary hearing. The trial court ruled Sowers was unavailable and that the prosecution could introduce all four hearsay statements. As it happened, two other hearsay statements came in without defense objection: Officer Wilkinson testified he spoke to Sowers briefly at the scene, and Sowers's brother testified he spoke to her by telephone while she was in the hospital.[6]

c.  *Discussion.*

We agree with Byron that three of the hearsay statements were testimonial within the meaning of *Crawford*: Sowers's statement to Wilkinson at the hospital, her videotaped police interview two weeks later, and her testimony at the preliminary hearing. However, as we will explain, Byron's conviction need not be reversed because (1) the trial court properly ruled Sowers was unavailable to testify at trial; (2) Sowers's preliminary hearing testimony was admissible under *Crawford* despite being testimonial; (3) the 911 call and the

---

[4] Evidence Code section 1370 provides, in pertinent part: "(a) Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met: [¶] (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant. [¶] (2) The declarant is unavailable as a witness pursuant to Section 240. [¶] (3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section. [¶] (4) The statement was made under circumstances that would indicate its trustworthiness. [¶] (5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official."

[5] Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

[6] We will treat these hearsay statements as if they had been objected to because defense counsel's failure to object arguably constituted ineffective assistance.

statement to Wilkinson at the scene were admissible under *Crawford* because they were nontestimonial hearsay statements, and, (4) even if Sowers's statement to Wilkinson at the hospital, the videotaped interview, and Sowers's statement to her brother were inadmissible under *Crawford*, they were merely cumulative to the admissible hearsay evidence and, therefore, did not prejudice Byron.[7]

### (1)   *Sowers was an unavailable witness.*

Byron claims all of Sowers's hearsay statements should have been excluded from evidence because she was available to testify. He argues that, although Sowers was unavailable when the trial court conducted a pretrial due diligence hearing, she subsequently became available while the trial was still going on. This claim is meritless.

■   Under Evidence Code section 240, subdivision (a)(5), a person is " 'unavailable as a witness' " if she is absent and the proponent of her statement, although exercising due diligence, has been unable to secure her attendance at trial. The proponent of the evidence has the burden of establishing unavailability. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1296 [18 Cal.Rptr.2d 796, 850 P.2d 1].) "[A]ppellate courts should independently review a trial court's determination that the prosecution's failed efforts to locate an absent witness are sufficient to justify an exception to the defendant's constitutionally guaranteed right of confrontation at trial." (*People v. Cromer* (2001) 24 Cal.4th 889, 901 [103 Cal.Rptr.2d 23, 15 P.3d 243].)

" 'What constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case. [Citation.] The term is incapable of a mechanical definition. It has been said that the word "diligence" connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. [Citation.] The totality of efforts of the proponent to achieve presence of the witness must be considered by the court. Prior decisions have taken into consideration not only the character of the

---

[7] In his response brief, the Attorney General argued Byron's *Crawford* claims would, in any case, fail under the forfeiture-by-wrongdoing doctrine because he had been involved in her failure to appear, citing *People v. Giles* (2007) 40 Cal.4th 833 [55 Cal.Rptr.3d 133, 152 P.3d 433]. However, the United States Supreme Court subsequently disapproved that case in *Giles v. California* (2008) 554 U.S. ___ [171 L.Ed.2d 488, 128 S.Ct. 2678], reasoning the doctrine did not apply where there was no evidence the defendant had killed the victim with the intent of preventing her from testifying. Although there is evidence Byron was in contact with Sowers during the trial, and had some connection with her failure to appear (see *post*), his conduct may not have met the *Giles* test.

proponent's affirmative efforts but such matters as whether he reasonably believed prior to trial that the witness would appear willingly and therefore did not subpoena him when he was available [citation], whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised [citation].' [Citation.]" (*People v. Sanders* (1995) 11 Cal.4th 475, 523 [46 Cal.Rptr.2d 751, 905 P.2d 420].) A finding of witness unavailability under Evidence Code section 240 satisfies the unavailability requirement of *Crawford.* (See, e.g., *People v. Wilson* (2005) 36 Cal.4th 309, 347 [30 Cal.Rptr.3d 513, 114 P.3d 758] ["because we conclude defendant was given an opportunity to cross-examine Loar in the first trial, and Loar was 'unavailable' under Evidence Code section 240, Loar's former testimony was admissible . . . . As such, admitting this testimony did not violate defendant's right of confrontation under the federal Constitution [as construed by *Crawford.*]"].)

On February 13, 2004, the trial court held a pretrial hearing on the question of Sowers's availability. After an investigator for the district attorney testified about his efforts, since December 16, 2003, to find her, the trial court ruled the prosecution had demonstrated due diligence and that Sowers was unavailable because "she appears to be willfully evading the process of the court."

Byron does not contest this initial finding of unavailability. Instead, he argues that on February 18, 2004, while the trial was in progress, "Sowers appeared in the courthouse prior to the playing of [her videotaped statement and Officer Wilkinson's testimony about his hospital conversation with her]. She was issued a subpoena by defense counsel in the district attorney's office and met the prosecutor. Defense counsel objected to the presentation of hearsay evidence while Sowers was available. The prosecutor responded that she intended to call Sowers as a witness, but could not relocate her. [¶] The prosecutor failed to act with due diligence in obtaining Sowers' testimony. Although she met Sowers in the District Attorney's Office, the prosecutor failed to issue Sowers a subpoena and failed to take any other actions to secure Sowers' continuing availability. Under these circumstances, Sowers was available to testify."

We disagree. It is clear from the record that if anyone had been in a position to insure Sowers's appearance at trial it was Byron, not the prosecutor.

On February 17, defense counsel told the trial court: "We've tried all weekend . . . to serve Christine Sowers, and have not yet been able to serve her." Trial began the following day. After the prosecutor made an opening

statement, the tape of the 911 call was played for the jury, Sowers's brother Mike Bernards testified, and then the officer who arrested Byron testified. At this point, defense counsel requested a short break, which the trial court granted. Following that break, the videotape of the August 2003 police interview was played for the jury. A detective testified briefly about the taping of the interview. Then the prosecutor called Officer Wilkinson. At this point, defense counsel asked for a sidebar and the following colloquy occurred:

"[Defense counsel]: Your Honor, I'm having a problem, because I served Christine Sowers in the D.A.'s office not more than 20 minutes ago. So I'd like to have an offer of proof of what's coming in next. [¶] Because if they have a witness that they can call, they should be calling that witness and not putting on videotapes and going through that, because that would be the best evidence of what's going on here.

"[The prosecutor]: Your Honor, when . . . the defense requested a break, apparently he was aware that the victim was going to be coming through his client, she was in the lobby of the D.A.'s office. I met her. The defense counsel did give her a subpoena. [¶] I had intended to call her when we got back from the break, but she disappeared again. And every time I send my detective out, I ask him, 'Is she out there?' She's not out there. Which is why I'm proceeding the way that I am, because she was there and now she's gone.

"[Defense counsel]: That's fair, Your Honor. [¶] But I'd like to have a break and track her down, because if she's here someplace in the building she should be called as a witness. She was validly served in the D.A.'s office. And if that's the case, we should have a body attachment issued for her immediately.

"The Court: Well, judging from today's proceedings it seems like she's under your client's control.

"[Defense counsel]: I served her. I don't know how she got here, but when she was here I served her.

"The Court: Well, prior to proceedings this morning, some colloquy with your client from which you indicated that—

"[Defense counsel]: That's correct.

"The Court:—he has her apparently under control.

"[Defense counsel]: But I did subpoena her so now she's under the court's control in terms of what's going on.

"The Court: Well . . . I understand the technicalities of a subpoena. However, I think we have to be realistic, too. [¶] So you might inquire of your client what's going on.

"[Defense counsel]: He hasn't talked to her. I have not let her talk to—

"The Court: *How did your client know that she was coming?*

"[Defense counsel]: *There's communications. I'm not saying there wasn't communications.* As of today my client has been with me the whole time." (Italics added.)

Although agreeing to recess until the afternoon so defense counsel could search for Sowers, the trial court remarked, "However, the court's concerned that it's being manipulated by the defendant." The trial court continued: "[T]hat really bothers me, that she's here voluntarily with your client's information to you that she's going to be here. [¶] [Defense counsel]: That's correct. [¶] The Court: And serving the subpoena and having her disappear, that's a little much."

When court resumed that afternoon, Sowers had still not been located. The prosecution put on Officer Wilkinson, who testified about his conversations with Sowers at the scene and at the hospital. Sowers's preliminary hearing testimony was then read to the jury.

The following morning, February 19, defense counsel informed the trial court that Byron's whereabouts were unknown. When Byron had still not appeared by 1:30 p.m., defense counsel told the court: "I talked to Chrysta Barcheers, and she's present in the courtroom. She has not had contact with [Byron]. But as an offer of proof, she had talked to him this morning and he mentioned that he was . . . on his way over here *with Christine Sowers.*" (Italics added.) The trial court concluded Byron had absconded, "[p]articularly in view of the prior occurrences in this case wherein the People have been unable to subpoena the complaining witness, at the commencement of the trial defense counsel informing the court that defendant indicated complaining witness was going to come to court and testify on his behalf; that she came to [the courthouse], that she was subpoenaed by the defense, and . . . the complaining witness again disappeared."

We conclude this record clearly demonstrates Sowers's unavailability at trial was not the result of the prosecution's lack of diligence, and that despite her brief appearance at the courthouse during the trial she continued to make herself unavailable as a witness. And even if Byron was not the direct cause of that unavailability, it appears he was in contact with Sowers and probably even knew where she could be located. In these circumstances, the trial court did not err by finding the unavailability requirement of Evidence Code section 240 had been met.

### (2) *Sowers's preliminary hearing testimony was admissible.*

■ "Although defendants generally have the right to confront their accusers at trial, this right is not absolute. 'If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial.' [Citations.] The defendant 'must not only have had the *opportunity* to cross-examine the witness at the previous hearing, he must also have had "an interest and motive similar to that which he has at the [subsequent] hearing." ' [Citation.] Under these rules, 'we have routinely allowed admission of the preliminary hearing testimony of an unavailable witness.' [Citation.] The recent decision of *Crawford* . . . , although changing the law of confrontation in some respects, left these principles intact." (*People v. Seijas* (2005) 36 Cal.4th 291, 303 [30 Cal.Rptr.3d 493, 114 P.3d 742]; see also *People v. Carter* (2005) 36 Cal.4th 1114, 1173–1174 [32 Cal.Rptr.3d 759, 117 P.3d 476] [" '[A]s long as a defendant was provided the *opportunity* for cross-examination, the admission of preliminary hearing testimony . . . does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective.' "].)

When Sowers testified at the preliminary hearing, Byron, who was present and represented by counsel, cross-examined her. Byron's interest in cross-examining Sowers at the preliminary hearing was very similar, if not identical, to what his motive at trial would have been, i.e., to discredit her story that he had assaulted her. Hence, Sowers's preliminary hearing testimony was admissible under *Crawford* because Sowers was unavailable to testify at trial.[8]

---

[8] We asked for supplemental briefing to address the following two questions: Assuming Sowers's preliminary hearing testimony is admissible under *Crawford* because Byron cross-examined her at that time and because she was properly adjudged unavailable to testify at trial, were her hearsay statements to Officer Wilkinson and Detective Gibson also admissible because Byron had the opportunity to cross-examine Sowers at the preliminary hearing? Does the answer depend on whether defense counsel had been notified by the prosecution of the fact

### (3) *Other hearsay statements were properly admitted because they were nontestimonial.*

The tape recording of Sowers's 911 call and her statement to Officer Wilkinson at the scene were properly admitted because they were nontestimonial under *Crawford.*

■ "*Crawford* recognized that if the statement in issue is nontestimonial, the rules of evidence, including hearsay rules, apply. *Crawford* stated: 'Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . .' [Citation.] Thus, state courts may consider 'reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was not testimonial. [Citation.]' [Citation.]" (*People v. Cervantes, supra,* 118 Cal.App.4th at p. 173.)

Sowers's statements to the 911 operator and to Officer Wilkinson at the scene were nontestimonial because "the primary purpose in giving and receiving them [was] to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage, supra,* 40 Cal.4th at p. 984; see *People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1597 [62 Cal.Rptr.3d 418] [where, instead of calling 911, victim went to police station to report spouse had assaulted and threatened to kill her, victim's initial statements to police were nontestimonial under *Crawford* because they were "a plea for help in the face of a bona fide physical threat"]; *People v. Brenn* (2007) 152 Cal.App.4th 166, 177, 178 [60 Cal.Rptr.3d 830] [victim's statements to 911 operator and responding officer, in response to their asking what was going on, were admissible under the excited utterance hearsay exception and nontestimonial under *Crawford*].)

Because the 911 call and the statement to Officer Wilkinson at the scene were nontestimonial under *Crawford* and admissible under California's

---

and/or the content of those hearsay statements? At least one case has concluded that the opportunity to cross-examine a witness at a preliminary hearing is sufficient to warrant the admission of other hearsay statements by that witness. (See *People v. Price* (2004) 120 Cal.App.4th 224, 239 [15 Cal.Rptr.3d 229] [victim's hearsay statement to police narrating infliction of physical injury, which was admissible under Evid. Code, § 1370, did not violate *Crawford* because defendant had cross-examined victim at preliminary hearing].) We need not decide this issue, however, because, as we explain, Sowers's hospital statements and her videotaped police interview were merely cumulative to other hearsay statements that were admissible.

excited utterance hearsay exception, and because Sowers was unavailable to testify at trial, this evidence was properly admitted.

### (4) Admission of Crawford-*violative statements was harmless error.*

Assuming for the sake of argument that Sowers's videotaped police interview, her hospital statement to Officer Wilkinson, and her telephone call to her brother were all improperly admitted under *Crawford*,[9] this evidence was merely cumulative. The arguably *improperly* admitted evidence proved Sowers and Byron argued over money, that Byron choked Sowers, bit her cheek and punched her in the back, and that Sowers was hospitalized for five cracked ribs and a punctured lung. The *properly* admitted evidence proved Sowers and Byron argued over money, that Byron choked Sowers, bit her cheek and punched her in the back, and that Sowers was hospitalized for five cracked ribs and a punctured lung.

In these circumstances, the confrontation clause errors were harmless because the jury would have convicted Byron even had the *Crawford*-violative statements been excluded. (See *People v. Geier* (2007) 41 Cal.4th 555, 608 [61 Cal.Rptr.3d 580, 161 P.3d 104] ["Even if Dr. Cotton's reliance on Yates's report violated defendant's Sixth Amendment rights as construed by *Crawford*, any error was harmless. Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]."]; *People v. Ledesma* (2006) 39 Cal.4th 641, 709 [47 Cal.Rptr.3d 326, 140 P.3d 657], fn. omitted ["Assuming for the purposes of discussion that Mr. Flores's statements to Officer Guerra were made in response to interrogation and that their admission in this case violated defendant's Sixth Amendment rights, we conclude that any error was nevertheless harmless beyond a reasonable doubt. To the extent that Officer Guerra's testimony tended to establish that Flores had been robbed and tended to connect defendant to that robbery, it was cumulative of other evidence."].)

In sum, we conclude that even if some *Crawford*-violative statements were improperly admitted into evidence, Byron suffered no resulting prejudice because the properly admitted hearsay statements overwhelmingly proved he had assaulted Sowers.

---

[9] See footnote 6, *ante.*

## DISPOSITION

The judgment is affirmed.

Kitching, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 29, S170898.