Filed 11/4/20  P. v. Priddy CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074108 |
| v. | (Super.Ct.No. BAF1800091) |
| JAMES GRADEN PRIDDY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  F. Paul Dickerson III, Judge.  Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted James Graden Priddy of two counts of felony elder abuse against two different victims.  (Pen. Code, § 368, subd. (b)(1); unlabeled statutory references are

to this code.) One of the victims died before trial. In a bifurcated proceeding, the trial court found true that Priddy committed one of the offenses while he was on bail. (§ 12022.1.) Priddy was sentenced to seven years in state prison.

On appeal, Priddy contends that (1) his constitutional right to confront the witnesses against him was violated by the admission of a recorded interview of the deceased victim, (2) the trial court abused its discretion under Evidence Code section 352 and prejudicially erred by admitting part of that recorded interview, and (3) the trial court had a sua sponte obligation to instruct the jury on the lesser included offense of misdemeanor elder abuse for one of the counts. We reject all of Priddy's contentions and affirm the judgment.

## BACKGROUND

A *Victim One—D.V.*[1]

In September 2017, Priddy was dating Jean B., who was living with her 78-year-old stepgrandfather, D.V. Sometime before September 2017, Priddy lived in a recreational vehicle parked on D.V.'s property. Priddy was 37 years old. After Priddy lived there for two weeks, D.V. asked Priddy to move, and Priddy did so two weeks later. D.V. attempted twice to get a restraining order against Priddy. D.V. told both Priddy and Jean that Priddy was no longer welcome on D.V.'s property.

---

[1] We refer to the victims by their initials and to the single witness by her first name, with or without last initials, to preserve their anonymity. (Cal. Rules of Court, rule 8.90(b).) No disrespect is intended.

On September 16, 2017, Priddy went to D.V.'s house with Jean. When D.V. noticed Priddy in Jean's car, D.V. told Jean that he was going to call the police. Jean asked D.V. to refrain from making that call and then wrestled D.V.'s phone out of his hand and threw it. While Jean and D.V. were wrestling over the phone, Priddy exited Jean's car and approached Jean and D.V. Priddy punched D.V. in the face and then punched him at least a couple of more times in the back of the head. Priddy hit D.V. "pretty hard." Priddy also "wrenched" or "twisted" D.V.'s head. D.V. went inside of his house to retrieve a baseball bat that he kept near the door. Priddy followed D.V. inside, and D.V. told him to leave. D.V. swung his bat and knocked out his front porchlight but missed Priddy. Priddy left the property.

D.V. called his sons, who arrived at D.V.'s house within one-half hour. D.V.'s sons urged him to call the police, which D.V. did. D.V.'s sons were concerned about the injuries D.V. had sustained, which included a black eye, a scraped nose, bruises on the back of his head, and redness on his scalp. He had pain in both his head and his neck. He also felt as though he might lose consciousness because of dizziness.

A law enforcement officer arrived, took D.V.'s statement, got a physical description of Priddy, and photographed D.V.'s injuries. Several days later D.V. identified Priddy in a photographic lineup.

B. *Victim Two—R.B.*

One year later, Jean allowed Priddy and another man, R.B., to sleep in her car. R.B. and Priddy were friends. R.B. was 75 years old. Jean worked for in-home support services as R.B.'s caregiver and had done so for approximately six months. When R.B.

was evicted from his home, Jean allowed him to sleep in her car while she was helping him look for another place to live.

On September 13, 2018, R.B. called 911 and reported that "[a] 38-year old man," whom he identified as Priddy, "just beat the shit out of [him]." Law enforcement responded to the scene and interviewed R.B. Audio and video of that interview were recorded on the deputy's body camera.

R.B. died before trial. His recorded interview with the deputy on the day of the incident and his 911 call on that day were played for the jury, and jurors were given copies of the corresponding transcripts. R.B. also testified at the preliminary hearing, and that testimony was read to the jury.

On the morning that R.B. called 911, he and Priddy were passengers in Jean's car when R.B. noticed a dead cat in the road. R.B. thought the cat belonged to him. Jean stopped the car and pulled over for R.B. to be able to verify the cat's identity. R.B. was in the front passenger seat, and Priddy was in the backseat behind Jean. R.B. was holding Jean's backpack on his lap. R.B. attempted to move the backpack onto Jean's lap so he could unbuckle his seatbelt and get out of the car. Priddy then punched R.B. in the back of the head with a closed fist, which R.B. described to the responding deputy as Priddy's having "reached over and just knocked the shit out of [him]." Continuing to use a closed fist, Priddy struck R.B. on the head and on his back several more times. While Priddy was striking R.B., R.B.'s seatbelt was secured. Jean unbuckled R.B.'s seatbelt, and both men exited the car. Priddy started pushing R.B. and continued punching him with a fist. The punches landed mainly on the "top part of [R.B.'s] body." At some point, Priddy

4

attempted to take R.B.'s cell phone. R.B. also described Priddy as "tryin[g] to strangle [R.B.]." Priddy pushed R.B. to the ground. While R.B. was on the ground, Priddy continued to punch and hit him. Jean described this as Priddy "pounding on" R.B.

Jean and R.B. both told the responding deputy that Priddy had threatened to kill them both if they contacted law enforcement. In a recorded interview with the responding deputy, Jean repeatedly explained that Priddy had threatened to kill her and R.B. According to her, Priddy said, "'I'm gonna kill both of you if the police come.'" Jean's videotaped interview with the deputy and the corresponding transcript were admitted into evidence. At trial, Jean testified that Priddy threatened to kill R.B. only. R.B. did not testify about the threat at the preliminary hearing.

R.B. injured his arm when he fell to the ground, and the responding deputy described the injury as a fresh wound consisting of "two abrasions, some blood, peeled skin, and a little bit of dirt around it." R.B. also had an abrasion on one of his knees. At the preliminary hearing, R.B. testified that he did not experience any pain in his head. But on the day of the incident, R.B. told the responding deputy that he had "some pain on [his] head."

After the incident, Jean drove Priddy to his mother's house, and she and R.B. drove elsewhere. Immediately after they dropped off Priddy, R.B. called 911 and reported to the 911 operator that Priddy "just beat the shit out of me." R.B. further explained that Priddy had "[s]lugged me in the mouth. Hit me in the head. Drug me outta the car. Beat the shit outta of me." R.B. first reported that he might need medical attention, which Jean confirmed, but then R.B. asked the 911 operator not to call an

5

ambulance. Jean intervened on the 911 call and also thought that R.B. might need medical attention. Jean then called 911 again for an estimated time of arrival. In that call, she reiterated that Priddy had hit R.B. in the head. At trial, Jean claimed not to remember what had happened. She was still dating Priddy.

Sometime after the incident with Priddy, R.B. was placed "in [a] boarding and care home," and Jean lost contact with him.

DISCUSSION

A. *Confrontation Clause*

Priddy contends that the trial court's admission of R.B.'s recorded statement to the investigating officer violated his Sixth Amendment right under *Crawford v. Washington* (2004) 541 U.S. 36, 59 (*Crawford*). Priddy contends that the recorded interview was testimonial and that he did not have a proper opportunity to cross-examine R.B. at the preliminary hearing, because R.B. did not testify at the preliminary hearing about Priddy threatening to kill R.B. and Jean. The People argue that at least the first part of the interview was not testimonial and that Priddy's right to confrontation was not violated because R.B. testified at the preliminary hearing. We need not resolve that dispute because we conclude that any error was harmless beyond a reasonable doubt.

The confrontation clause operates as a general bar against the admission of testimonial hearsay unless "the declarant is unavailable, and . . . the defendant has had a prior opportunity to cross-examine." (*Crawford*, *supra*, 541 U.S. at p. 59.) A confrontation clause error requires reversal unless it was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24. (*Delaware v. Van Arsdall*

6

(1986) 475 U.S. 673, 684.)  In determining whether a confrontation clause violation is harmless beyond a reasonable doubt, we consider numerous factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  (*Ibid.*)

Assuming for the sake of argument that R.B.'s videotaped interview with the deputy was improperly admitted under *Crawford*, any error was harmless beyond a reasonable doubt because the "evidence was merely cumulative."  (*People v. Byron* (2009) 170 Cal.App.4th 657, 676 (*Byron*); *People v. Ledesma* (2006) 39 Cal.4th 641, 709 (*Ledesma*).)  The purportedly improperly admitted evidence tended to prove that Priddy punched R.B. multiple times while the two men were seated in the car, continued to attack R.B. outside of the vehicle, pushed R.B. to the ground, thereby injuring R.B.'s arm, and threatened to kill R.B. and Jean if they called the police.  At the preliminary hearing, R.B. testified about all of those details of Priddy's attack except for the part about Priddy threatening R.B.  But in Jean's recorded interview with the responding deputy, which was admitted into evidence, she too told the deputy that Priddy had threatened to kill them both.  She also testified that Priddy had threatened to kill R.B.  Priddy's counsel did not ask Jean any questions about the threat.  R.B.'s statement about the threat therefore was cumulative of evidence otherwise admitted and not subjected to any particular scrutiny on cross-examination.  Moreover, there was overwhelming evidence of Priddy's guilt of felony elder abuse against R.B., namely, R.B.'s testimony at

7

the preliminary hearing, his 911 call on the day of the incident, Jean's statements to the investigating officer and the 911 operator, and Jean's testimony.

Under these circumstances, we conclude that any confrontation clause error was harmless beyond a reasonable doubt, because the jury would still have convicted Priddy if the statements in question had been excluded. (*Ledesma*, *supra*, 39 Cal.4th at p. 709; *Byron*, *supra*, 170 Cal.App.4th at p. 676.) Because we conclude that admission of the recorded interview was harmless beyond a reasonable doubt, its admission under Evidence Code section 352, if an abuse of discretion, also was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. Earp* (1999) 20 Cal.4th 826, 878 [*Watson* harmlessness standard applies to erroneous admission of evidence under Evid. Code, § 352].)

B. *Misdemeanor Elder Abuse Instruction*

Priddy argues that the trial court prejudicially erred by failing to instruct the jury on the lesser included offense of misdemeanor elder abuse for the count involving R.B. We disagree.

The trial court has a sua sponte obligation to "'""instruct on the general principles of law relevant to the issues raised by the evidence."'"" (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) That obligation extends to lesser included offenses that are supported by substantial evidence. (*Id.* at pp. 154-155.) "A trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584 (*Manriquez*); *Breverman*, *supra*, at pp. 154-155.) "'Substantial evidence' in this context

8

is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed." (*Breverman*, at p. 162.) "[I]nstructions on lesser included offenses are not required when the evidence shows that, if guilty at all, [the] defendant committed the greater crime." (*People v. Lema* (1987) 188 Cal.App.3d 1541, 1545.) We independently determine whether an instruction on a lesser included offense should have been given. (*Manriquez, supra*, at p. 584.)

"Misdemeanor elder abuse is a lesser included offense of felony elder abuse." (*People v. Racy* (2007) 148 Cal.App.4th 1327, 1335 (*Racy*).) "[T]he difference between felony elder abuse and misdemeanor elder abuse is whether the abuse is perpetrated 'under circumstances or conditions likely to produce great bodily harm or death.'" (*Id.* at p. 1334; § 368, subd. (b)(1).) "If it is, the crime is a potential felony. (§ 368, subd. (b)(1).) If it is not, the crime is a misdemeanor. (§ 368, subd. (c).)" (*Racy, supra*, at pp. 1334-1335.) We therefore analyze whether a reasonable jury could have concluded that Priddy did commit elder abuse but not under circumstances and conditions that were likely to produce great bodily harm or death.

Priddy maintains that there is sufficient evidence from which a jury could have concluded that he did not use the requisite amount of force necessary to constitute felony elder abuse. The argument is based on the purported lack of severity of R.B.'s injuries, as well as the claim that Priddy only punched R.B. from behind while the two men were seated in the car, from which Priddy infers that the amount of force must not have been great. Both arguments lack merit.

9

Assuming for the sake of argument that R.B.'s injuries were not severe, it does not follow that Priddy did not attack R.B. "under circumstances or conditions likely to produce great bodily harm or death." (§ 368, subd. (b)(1).) The relevant inquiry for felony elder abuse is not whether the victim sustained a severe injury or any injury at all. (See *People v. Clark* (2011) 201 Cal.App.4th 235, 243 (*Clark*) ["Felony child abuse does not require force likely to produce great bodily injury"].) Instead, the question asked the jury is the *likelihood* that the conditions and circumstances of the assault *could* "produce great bodily harm or death." (§ 368, subd. (b)(1).) The nature and severity of the injuries suffered by the victim are among the factors relevant to that inquiry. (*Clark*, *supra*, at p. 243.) Other relevant factors include "the characteristics of the victim and the defendant" and "the nature of and amount of force used by the defendant." (*Id.* at p. 245.)

Like the defendant in *Clark*, *supra*, 201 Cal.App.4th 235, Priddy "relies heavily on cases involving the charge of assault with force likely to produce great bodily injury" to support his claim that the use of force from Priddy's hands or fists alone was not likely to cause great bodily harm or death, as shown by Priddy's purportedly minor injuries. (*Id.* at p. 243.) We agree with *Clark* that the argument "misses the point."[2] (*Ibid.*) The statutory definition of the assault crime is materially different from the statutory

---

[2]    *Clark* involved felony child abuse. (*Clark*, *supra*, 201 Cal.App.4th at pp. 241-242.) As our Supreme Court has recognized, "[s]ection 368 was patterned on and is virtually identical to section 273a," the felony child abuse statute. (*People v. Valdez* (2002) 27 Cal.4th 778, 785, fn. 4.) "Cases interpreting one section are therefore appropriately used to interpret the other." (*Ibid.*)

definition of elder abuse. A person violates section 245, subdivision (a)(4), by using "any means of force likely to produce great bodily injury." The cases interpreting that provision therefore "quite naturally focus on the force *actually used* to determine if that force was likely to cause great bodily injury to the victim." (*Clark*, at p. 243.) Felony elder abuse, by contrast, "does not require force likely to produce great bodily injury. It requires the willful infliction of injury *under circumstances and conditions likely to produce great bodily injury*. While force may be one circumstance or condition, it is not the only circumstance or condition that may support a conviction for" felony elder abuse. (*Ibid.*; § 368, subd. (b)(1).)

Here, regardless of the severity of the injuries R.B. sustained, there was no evidence from which a reasonable jury could infer that Priddy did commit elder abuse but not under circumstances and conditions likely to produce great bodily injury. Priddy was 40 years younger than R.B., who required an employed caretaker. Priddy punched R.B. multiples times in the head and the back while the two men were seated in a car, and R.B. described those blows as painful. Priddy claims that the force that he used in the car was somehow diminished because he was seated and positioned behind R.B. while striking him. But regardless of the amount of force Priddy employed while punching R.B. in the car, the attack did not end there. While both men were outside and standing, Priddy continued to punch R.B. and even attempted to strangle him. Then, after pushing R.B. to the ground with enough force to injure R.B.'s arm, Priddy punched and kicked R.B. while R.B. was on the ground. There is no evidence that the attack proceeded in any other manner, and no reasonable jury could infer that the attack was not conducted

11

"under circumstances or conditions likely to produce great bodily harm or death."
(§ 368, subd. (b)(1).)

We consequently conclude that the trial court did not err by failing to instruct the jury on misdemeanor elder abuse.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

RAMIREZ
P. J.

SLOUGH
J.