Filed 5/27/21  P. v. Gonzalez CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JONATHAN JOSUE GONZALEZ,<br><br>　　　　Defendant and Appellant. | B300422<br><br>(Los Angeles County<br>Super. Ct. No. PA089384) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed as modified.

　　　　Mary Jo Strnad, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Jonathan Gonzalez guilty of two counts of attempted murder.  On appeal, he raises numerous contentions, the main one being that the trial court violated his Sixth Amendment confrontation rights by finding that one victim was unavailable to testify and allowing her preliminary hearing testimony to be introduced in lieu of her live testimony.  Gonzalez also contends that evidence identifying him was insufficient to support his convictions.  We reject these and other contentions but modify the judgment to correct a sentencing error.

## BACKGROUND

I.    The attempted murders

On the afternoon of November 30, 2016, the two juvenile victims Mario B. and Preciosa L. were at a bus stop.  Although both were members of the Pacoima Treces gang, they were in Blythe Street gang territory.  A witness near the bus stop saw a man and woman in a gray Nissan yelling at the two victims.  The man and woman exited the car and "squared up" with the victims.  The woman said, " 'Blythe Street' " or " 'What up, bitch.' "  After a few minutes of exchanging words, the two victims walked away, and the man and woman returned to their car and pursued them.  The man wore dark blue jeans and a dark jersey shirt.  About 45 minutes later, witnesses heard gunshots and saw Mario and Preciosa on the ground.  Both had been shot.

A recording from a responding officer's bodycam was played for the jury.  In that recording, Mario said "Burros"[1] shot him,

---

[1] This apparently is a derogatory term for the Blythe Street gang.  It is also spelled "Burrows" in portions of the record.

and his attackers were two "Mexicans" who said, " 'Fuck Pacas.' " Preciosa added that the attackers said, " 'fucken Pacoima.' "

En route to the hospital, Preciosa made statements that were also captured by an officer's bodycam recorder. She said that "they" came up from behind her and Mario, and a Hispanic man said, " 'Fuck Pacas.' " The man was from " 'Burros. Blythe.' " Preciosa also said she was a member of the Pacoima Pacas gang, and her moniker was Wicked.

At the hospital later on the day she was shot, Preciosa repeated to Detective Felipe Martinez that she was from Pacoima Tiny Locas, and her moniker was Wicked. Preciosa told him that earlier that day, a new model Honda with tinted windows pulled alongside her and Mario. A man and woman in the car yelled, " 'Blythe Street.' " The man was 20 or 25 years old. The man and woman got out of the car, and the man confronted Mario, saying, " 'This is Blythe. This is our Town.' " Mario replied, " 'Pacas Trece.' " The woman similarly confronted Preciosa with, " 'Blythe Street, bitch.' " Preciosa responded in kind, " 'Pacas Trece Tiny Locas, bitch.' " The group argued until the man and woman returned to their car. Although the woman told the victims to meet around the corner to fight, Preciosa and Mario did not meet them. Instead, after waiting at a nearby swap meet for almost an hour, they were walking when an older model gray Honda did a U-turn in front of them. The male driver was bald, and the male Hispanic passenger wore a blue Brooklyn Dodgers hat with a white B logo on it. The passenger got out of the car, said " 'Fuck Pacas,' " and shot Mario. Saying, " 'You too, bitch,' " he then shot Preciosa. Preciosa described the shooter as a male Hispanic, 5 feet 8 or 9 inches tall, and wearing blue clothing, including the Brooklyn Dodgers hat.

A week after being shot, Mario gave a similar account to the detective on December 6, 2016.[2] Mario said that the car that first approached him and Preciosa was an older model blue BMW. The passenger, a male Hispanic, got out of the car. He was 5 feet 8 or 9 inches tall with a medium complexion, stocky build, and tattoos on his arms. He wore dark clothing, blue jeans, and a blue Brooklyn Dodgers baseball hat with a B logo on it. Mario associated the hat with the Blythe Street gang. Mario became concerned, because Preciosa was wearing a Pittsburgh Steelers hat, which is associated with the Pacoima Pacas gang. The man said, "Blythe Street," and told Mario he had a "strap" (a gun), and they should "get down." Mario replied that he was from Pacas Trece but wanted no problems. However, the man told them to meet around the corner "to handle this."

Instead of going to the meeting, Mario and Preciosa waited at the nearby swap meet until they thought it was safe. After leaving the swap meet, Mario saw an older model gray car driven by a male Hispanic with a shaved head. The male Hispanic passenger—the same man who had confronted Mario earlier—wore a Brooklyn Dodgers baseball hat with a B logo on it. The driver got out of the car and followed Mario and Preciosa on foot. The man said, " 'Fuck Pacas' " and shot Mario and Preciosa, yelling " 'Blythe Street' " as he ran away. Mario said that the shooter was a male Hispanic, 18-to-19 years old, bald, medium build, 5 feet 10 to six feet tall, and wore blue clothing.

A month after the shooting, officers conducted a probation compliance check on Gonzalez. They found baseball hats with the letter "B" on them.

---

[2] Mario was still hospitalized.

A police officer assigned to monitor the Blythe Street gang testified that he had almost daily encounters with Gonzalez and had arrested him and searched his residence. Gonzalez typically wore a sports hat associated with Blythe Street: Brooklyn Nets, Boston Red Sox, Brooklyn Dodgers with a B on it, or the Raiders. Gonzalez would admit his gang membership by saying "B's up."

The parties stipulated that Gonzalez is 5 feet 5 inches tall when wearing shoes.

II.    Identifications

Based on Mario and Preciosa's descriptions of the shooter, Detective Martinez compiled five photographic lineups consisting of six photographs each. On December 8, 2016, the detective admonished Mario that he was going to show him photographs but the person involved in the crimes may not be in them. The detective then showed the lineups to Mario, who rejected the first two but hesitated over the third, saying that the person in the second position, Gonzalez, was the man who hit him up during the initial incident and was the passenger in the car during the second incident. Mario recognized "100 percent" Gonzalez's face, the three dots near his eye, and facial hair. Mario wrote, "facial hair three dots and eye" and drew an arrow to Gonzalez's photo.

The detective then reinterviewed Preciosa on December 15, 2016. She repeated that just before she and Mario were shot, an older gray model Honda driven by a bald Hispanic man pulled alongside them. The car's passenger wore a Brooklyn Dodgers hat with a B logo, and the passenger was the shooter. The detective then showed Preciosa a photographic lineup, and she told him that the person in the second position, Gonzalez, resembled the shooter and looked familiar. At this point, the detective began to record the interview. Preciosa initially said,

5

"Well Two . . . this one, none of these, none of these catch my attention." The detective then asked if the person in the second position was the person she saw driving back, and Preciosa said he could have been because he looked "too familiar, too familiar, I'm thinking it was this one that was wearing a B hat." She agreed that he was the one who hit her up and crept up on her. When the detective asked Preciosa to rephrase what the individual did, she said he "was the one, either . . . he was the passenger, the shotgun one." She knew for sure that he was the one wearing the B hat. The detective asked, "And that's the one that shot you?" Preciosa answered, "Again, just . . . yeah. Cause the one that shot had the B hat."

III.    Mario and Preciosa's later statements and trial testimony

About two years after he was shot, Mario, who was now incarcerated, told a detective in a follow-up interview that he did not remember the incident and wanted nothing to do with the investigation, because involvement in it could endanger him in the general prison population. At trial, Mario continued to say he did not remember anything about the shooting or about identifying Gonzalez.

Preciosa invoked her Fifth Amendment privilege at trial and was accordingly found unavailable. Her preliminary hearing testimony was therefore read in lieu of her live testimony. At the outset of the preliminary hearing, Preciosa had refused to testify and was uncooperative. She refused to show the scar on her arm caused by the gunshot wound, repeatedly said she did not want to be there, and refused to sit down. When shown video of her December 15, 2016 interview with Detective Martinez, she admitted she was the person in the footage but said she did not remember the video. As to her identification of Gonzalez,

6

Preciosa testified that she had been on medication when she made it so she just "pointed out a person." She did not remember identifying the man who shot her and Mario. She also did not remember any details of the incident, including being at the location of the shooting and being with Mario. However, she did admit belonging to a gang, although she would not identify which one. She also remembered the description of the shooter she gave to the detective. She admitted having a conviction for misdemeanor battery on emergency personnel.

On cross-examination, Preciosa said that when the detective asked if the guy in the photograph was in the car, she just agreed with him. She denied that Gonzalez was the guy in the car, and she did not believe he was the shooter.

IV.     Defense eyewitness and identification expert testimony

An expert in eyewitness memory and identification testified for the defense. According to him, memory does not work like a camera, capturing everything within the aperture of its lens. Rather, there are limits on our attention. Stress and trauma inhibit processing information. Also, human memory is changeable. Gaps in memory can be filled in, and memory can be reconstructed, a process called inferential memory. Then, once a person decides how something happened, they "buy into it" 100 percent, right or wrong.

The expert also testified generally about the proper way to administer lineups and problems with the selection process. Identifications should be double-blind, meaning that the person administering it should not know who the suspect is and should limit interaction with the witness to avoid inadvertently or deliberately influencing the witness. To create a fair lineup, the "fillers" must match what the witness is looking for. Otherwise, a

lineup can be suggestive if only one viable choice is presented, for example, where the suspect is a middle-aged White man, and the lineup has only one middle-aged White man. Also, people treat lineups like a multiple choice test in which they pick the best answer, which is why it is important to admonish the witness that the person they are seeking may not be in the lineup. "Relative judgment" occurs when a witness picks someone relative to other options as opposed to actually recognizing the person.

V.    Verdict and sentence

A jury found Gonzalez guilty of two counts of attempted murder (Pen. Code,[3] §§ 664, 187, subd. (a)) with true findings on allegations that the attempted murders were willful, deliberate, and premeditated. The jury also found true personal firearm use (§ 12022.53, subds. (b), (c), (d), (e)(1)), gang (§ 186.22, subd. (b)(5)), and personal infliction of great bodily injury (§ 12022.7, subd. (a)) allegations.

On July 24, 2019, the trial court sentenced Gonzalez on count 1 to life with a minimum parole eligibility of 15 years per the gang enhancement, 25 years to life for the gun enhancement, and three years for the great bodily injury enhancement. The trial court imposed the same sentence on count 2, to run consecutive to the sentence on count 1.

---

[3] All further undesignated statutory references are to the Penal Code.

## DISCUSSION

I.     Admission of Preciosa's preliminary hearing testimony

Based on Preciosa's assertion of her Fifth Amendment privilege against self-incrimination and her refusal to answer questions, the trial court found her unavailable to testify. Her preliminary hearing testimony was therefore introduced in lieu of her live testimony. Gonzalez now contends that this violated his Sixth Amendment right to confront Preciosa.

### A.   *Additional background*

After Preciosa testified at the preliminary hearing but before trial, she was charged in an unrelated case with felony murder. At the time of trial, a transfer hearing to adult court under Welfare and Institutions Code section 707 was pending. Her counsel therefore expressed concern that any testimony Preciosa gave about gang affiliation in the current trial could be used against her at the transfer hearing, where Preciosa's past behavior, probation violations, and amenability to being rehabilitated would be relevant.

The trial court held a hearing under Evidence Code section 402 (402 hearing). At that hearing, Preciosa said on direct examination she could not remember talking to Detective Martinez, being shown a photographic lineup, or any of her statements about what happened. When asked if she was with Mario on the day of the shooting or if she was dating him, she asserted the Fifth Amendment. She did not remember telling law enforcement what happened the day she was shot or giving a description of the shooter to law enforcement. On cross-examination by defense counsel, Preciosa asserted the privilege

9

when asked any gang-related questions and questions about what happened the day she was shot.

The trial court found that Preciosa had properly invoked the Fifth Amendment and that she was not answering questions. Accordingly, the trial court found that she was unavailable as a witness and that her preliminary hearing testimony could be used in lieu of her live testimony. Defense counsel objected to using the preliminary hearing testimony because counsel's cross-examination during that hearing had been limited due to Preciosa's lack of cooperation. The trial court overruled the objection, noting that Preciosa answered questions at the 402 hearing in the same way she did at the preliminary hearing, which is to say, uncooperatively. "So her being on the witness stand here would not change the circumstance," and Preciosa had repeatedly said she did not remember the circumstances of the shooting. "Again, today it's not like she's being cooperative or she would answer any questions anyway." And, based on her pending juvenile matter, her assertion of the Fifth Amendment was appropriate.

Preciosa's preliminary hearing testimony, which we summarized above, was then read to the jury.[4]

B.    *Confrontation rights*

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to confront witnesses against them. This constitutional guarantee ensures that the

---

[4] This background shows that Gonzalez adequately objected under the Sixth Amendment. We accordingly reject the People's assertion that Gonzalez forfeited any issue on appeal regarding that issue.

10

defendant is able to cross-examine witnesses, thereby testing their recollection and compelling them to face a jury so that it may judge the witnesses by, for example, their demeanor. (*People v. Louis* (1986) 42 Cal.3d 969, 982.)  Denying or significantly diminishing this confrontation right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling into question the integrity of the fact-finding process.  (*People v. Herrera* (2010) 49 Cal.4th 613, 621.)

However, a defendant's confrontation right is not absolute and may give way when a witness is entitled to assert the Fifth Amendment privilege against self-incrimination and the defendant had a prior opportunity to cross-examine that witness. (*People v. Seijas* (2005) 36 Cal.4th 291, 303 (*Seijas*).)  The defendant must have had the opportunity to cross-examine the witness at the previous hearing *and* have had an interest and motive similar to that at the subsequent hearing.  (*Ibid.*)  To be unavailable on this ground, the witness must not only assert the privilege but be *entitled* to assert it.  (*Ibid.*)  "To deny an assertion of the privilege, 'the judge must be " '*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate.' " ' "  (*Id.* at pp. 304–305.)  Where the relevant facts are undisputed, we independently

11

review a trial court's ruling permitting a witness to assert the privilege. (*Id.* at p. 304.)[5]

Evidence Code section 1291 codifies this exception to the hearsay rule. Under that section, prior testimony is not made inadmissible by the hearsay rule if, first, the declarant is unavailable as a witness and, second, the party against whom that testimony is offered had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which the party has at the hearing. (Evid. Code, § 1291, subd. (a)(2).) A person is unavailable as a witness when the person is exempted on "the ground of privilege from testifying concerning the matter to which his or her statement is relevant." (*Id.*, § 240, subd. (a)(1).)

## 1. Unavailability as a witness

Per Evidence Code section 1291, we first consider whether Preciosa was unavailable as a witness. The trial court here found that she was unavailable, partially based on her assertion of her

---

[5] Gonzalez cites *Fost v. Superior Court* (2000) 80 Cal.App.4th 724 and *People v. Seminoff* (2008) 159 Cal.App.4th 518, to argue that the Fifth Amendment privilege may only be used as a shield and not as a sword to block inquiry. We have no issue with that argument as a general proposition. But those cases have little application to the scenario before us. *Fost* involved the tension between the right of confrontation and the newspaper shield law, which is not at issue here. In *Seminoff*, a witness testified for the defense at a suppression hearing but *then* asserted the Fifth Amendment on cross-examination by the prosecution. The trial court therefore struck the witness's testimony. (*Seminoff*, at p. 525.) *Seminoff* is factually and procedurally distinguishable.

12

Fifth Amendment privilege against self-incrimination. A witness may assert that privilege if the witness has reasonable cause to apprehend danger from a direct answer to a question. (*Seijas*, *supra*, 36 Cal.4th at p. 304.) " 'To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.' " (*Ibid.*) We liberally construe that privilege in favor of the right it was intended to secure. (*Ibid.*)

Here, Gonzalez argues that nothing Preciosa could testify to in the current action could incriminate her in the unrelated juvenile matter, because Preciosa's only involvement in this case was as a victim. Thus, the crimes in the current case were independent of the crimes Preciosa allegedly committed in the juvenile case. That is correct. Even so, it is inaccurate to say that Preciosa had no reasonable cause to apprehend danger from a direct answer to a question she might be asked in this case. (See, e.g., *Seijas*, *supra*, 36 Cal.4th at p. 304.) Any testimony she might give about gang-related aspects of the current case could be used to impeach her in the juvenile matter. Gonzalez counters that this was not a valid reason to assert the privilege because other evidence established Preciosa's gang affiliation, thus placing her in no additional jeopardy. However, this argument misses the point. Even if other evidence incriminated Preciosa as to her gang affiliation, the Fifth Amendment provides that she cannot be compelled to give such evidence against herself.

In addition, Preciosa was facing not just the criminal charges but a transfer hearing from juvenile to adult court. The significance of that transfer hearing cannot be overstated.

Rehabilitation is the goal in juvenile court, so staying in the juvenile system can result in dramatically different and more lenient treatment than what a juvenile may face in adult court. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303.) Therefore, a transfer hearing is one of the most crucial and important proceedings that will determine a youthful offender's future.

In ruling on the transfer motion, a juvenile court takes a holistic approach in determining whether the minor should be transferred to adult court. The juvenile court must consider any relevant evidence and the minor's degree of criminal sophistication, whether she can be rehabilitated, and her delinquency history. (Welf. & Inst. Code, § 707, subd. (a)(3)(A), (B), (C).) When considering criminal sophistication, the trial court must also consider any relevant factor, such as the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of peer pressure on her actions, and the effect of her family, community environment, and childhood trauma. (*Id*., § 707, subd. (a)(3)(A)(ii).)

A trial court considering these factors could find they weighed against keeping Preciosa in juvenile court, based on the circumstances surrounding the current case. On the day of the shooting, Preciosa was with Mario, her then-boyfriend and a gang member. She too was a gang member. Preciosa was openly wearing Mario's gang-related hat, even though she was in another gang's territory. And although Mario testified that he had tried to defuse the situation during the initial encounter, there was evidence that Preciosa wanted to fight with the man

14

and woman who first approached them. Preciosa's mere association with Mario and her behavior thus reflected poorly on her choices, impetuosity, ability to assess the risks and consequences of her behavior, and to the danger she posed to herself and others. In short, the evidence was incriminating and could have weighed against her at the transfer hearing.

Gonzalez, however, also argues that the trial court's ruling was overbroad because Preciosa asserted her Fifth Amendment privilege only to questions about her gang affiliation. That was certainly her counsel's focus during argument about admitting Preciosa's testimony. However, although the defense asked questions primarily about the gang aspects of the current case, Preciosa also asserted the privilege when asked if she was with Mario and if he had a knife the day they were shot.

Moreover, the trial court also found Preciosa unavailable because of her general refusal to answer questions. Under Evidence Code section 240, subdivision (a)(6), a witness is unavailable if she persistently refuses to testify despite having been found in contempt for refusing to testify. In *People v. Lawson* (2020) 52 Cal.App.5th 1121, 1125, for example, the sexual assault victim testified at a preliminary hearing and at a first trial, which ended in a mistrial on some counts. Citing her emotional and mental well-being, the victim refused to testify at a second trial. After hearings that verified the victim's unwillingness to testify, the trial court found her unavailable as a witness. (*Id.* at p. 1128.) *Lawson* found that the trial court was not required to take the extreme step of finding the witness in contempt to induce her testimony. (*Id.* at p. 1130; accord, *People v. Smith* (2003) 30 Cal.4th 581, 624.) Rather, a trial court need only take reasonable steps to induce the witness to testify unless

15

it is obvious such steps would be unavailing. (*Lawson*, at p. 1130; see also *People v. Farmer* (1983) 145 Cal.App.3d 948, 951 [witness unavailable where record showed she would refuse to testify to *any* matter to which she had previously testified; no requirement witness assert privilege separately to specific questions]; accord, *People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1547–1548.)

Although *Lawson* involved a sexual assault victim, which Preciosa was not, that is not a sufficiently distinguishing factor. Preciosa, at the preliminary hearing and at the 402 hearing, refused to answer most questions beyond claiming she did not remember anything. At the preliminary hearing, the trial court threatened her with contempt to no avail. Therefore, the trial court took reasonable steps to get Preciosa to testify and did not have to find her in contempt before finding her unavailable. This is especially so considering that Preciosa, notwithstanding her bad attitude and obstreperous nature, was a minor. The record is clear that Preciosa would refuse to answer questions about the shooting and that the trial court took reasonable steps to induce her to testify.

We therefore conclude that the trial court did not err by finding Preciosa unavailable as a witness.

## 2. Opportunity for cross-examination

Having found that the trial court did not err by finding Preciosa unavailable, the next question is whether Gonzalez had the opportunity to cross-examine her with an interest and motive similar to that which he had at trial. (Evid. Code, § 1291, subd. (a)(2).) Admissibility of prior testimony under Evidence Code section 1291 does not depend on whether the defendant availed himself of that opportunity. (*People v. Wilson* (2005) 36 Cal.4th

309, 343.)  And the interest and motive at the earlier proceeding need only be similar to the interest and motive at the later proceeding.  (*People v. Alcala* (1992) 4 Cal.4th 742, 783–784.)

Gonzalez now argues that his counsel did not have a fair opportunity to cross-examine Preciosa at the preliminary hearing.  Rather, his counsel conducted a limited cross-examination of Preciosa at that hearing in deference to the trial court and because of Preciosa's truculence.  We are unpersuaded.  The trial court did tell Preciosa at the preliminary hearing that it would try to get her out of court as fast as possible.  And, when Preciosa refused to remain seated toward the end of direct examination, the trial court assured her they were close to finishing.  However, Gonzalez confuses the trial court's attempts to reassure and to calm Preciosa with a rush to conclude the hearing at the expense of cross-examination.  To the contrary, the trial court repeatedly advised Preciosa that it understood she did not want to be there but "this hearing is going to continue, and the quicker we get done with it, the quicker you'll be on your way."  The trial court further advised Preciosa that it could hold her in contempt but did not want to do that.  And it told her that they would work into the lunch hour to finish and if they did not finish, then Preciosa would be ordered back for the next day and the next, if it took that long.  Therefore, the trial court was clear that the hearing would *not* be cut short because of Preciosa's attitude.

Indeed, when it came time for the defense to cross-examine Preciosa, she answered counsel's questions more readily.  As to the identification, Preciosa said she did not remember if the detective suggested she pick a certain photograph.  Preciosa testified that when the detective asked if that was the guy in the

17

car, she just agreed even though she did not believe he was the shooter. She added that she was heavily medicated when she identified Gonzalez, and he was not the guy who shot her.

This also refutes Gonzalez's next argument about cross-examination, that his counsel's interest and motive at the preliminary hearing were dissimilar to those at trial. Counsel's interests and motives at both proceedings were the same—to discredit Preciosa's identification. Given that on direct examination Preciosa said she did not remember the incident or the identification, and on cross-examination she recanted her identification of Gonzalez, counsel achieved that goal. Indeed, defense counsel moved to dismiss for insufficiency of the evidence at the preliminary hearing, arguing that nothing tied Gonzalez to the crime and that Preciosa had said he was not the shooter. This is no different than Gonzalez's position at trial. (See, e.g., *People v. Carter* (2005) 36 Cal.4th 1114, 1172 [defendant's interest and motive sufficiently similar at preliminary hearing and trial to satisfy Evidence Code section 1291].)

### 3. Prejudice

Any error in admitting Preciosa's preliminary hearing testimony must be reviewed under the *Chapman v. California* (1967) 386 U.S. 18, 24, standard, that is, whether the error was harmless beyond a reasonable doubt. (*People v. Byron* (2009) 170 Cal.App.4th 657, 676.) Even under that standard, and acknowledging that identification was the key issue, we cannot agree that admitting Preciosa's preliminary hearing testimony in lieu of her live testimony was prejudicial. As the trial court noted, Preciosa was unambiguous in her unwillingness to testify about the key issues. At the preliminary hearing, she was disrespectful, refused to sit, and decried what she felt was a

18

violation of her rights. She undercut the validity of her identification by saying she was medicated when she made it and had just "pointed out a person." She also denied remembering identifying the man who shot her and Mario. At the later 402 hearing, she continued to say she did not remember anything of substance about the crime, including anything concerning the identification. Beyond a reasonable doubt, Preciosa would have continued in this vein had she testified at trial.

That being so, and even if the trial court erred by finding Preciosa unavailable as a witness, it is unclear how her live testimony would have helped the defense. Preciosa had already retreated from the identification at the preliminary hearing. Mario had also retracted his identification. Therefore, to the extent the defense goal was to get Preciosa to recant her identification, Preciosa had already done so at the preliminary hearing. And, instead of reinforcing the defense theory that Preciosa had misidentified Gonzalez, her and Mario's retractions can also be viewed as *strengthening* the identifications. Having Preciosa at trial continue her protestations and claims not to recall even the smallest detail about what happened could have lent, in the jury's mind, credibility to the identifications. Stated simply, the jury could have believed that the witness doth protest too much.

Otherwise, the defense effectively attacked Preciosa's identification by cross-examining the detective who administered the lineup. Counsel elicited that the detective knew that Gonzalez was the suspect, which, according to the defense expert, violated the better practice of having the person administering the lineup be ignorant of who is the suspect to avoid deliberately or inadvertently suggesting to the witness who is the suspect.

19

Counsel also highlighted potential problems with how the lineup was compiled; for example, Gonzalez might have stood out from the other suspects because he had three dots tattooed on his face. The defense buttressed this argument through the eyewitness identification expert's testimony about suggestive identification procedures, including that no person should stand out.

We therefore conclude that any error in finding Preciosa unavailable and in admitting her preliminary hearing testimony was harmless beyond a reasonable doubt.

II.     Exclusion of impeachment evidence

Gonzalez next contends that the trial court improperly excluded evidence of Preciosa's pending juvenile matter. We disagree.

A.     *Additional background*

In 2018, Preciosa allegedly left her suitable placement, stole a car, and crashed it into another car, killing a person. By the time of trial, she therefore had a pending juvenile petition for felony murder with the possibility it would be reduced to gross vehicular manslaughter. The defense acknowledged it could not bring up the charges but wanted to elicit the facts to establish Preciosa's moral turpitude. In response, the prosecutor argued that admitting the evidence would require a trial within a trial, when the defense had other avenues of impeachment, namely that Preciosa was an active gang member.

The trial court denied the request because the juvenile petition was merely pending and had not yet been sustained. The trial court found that inquiry into Preciosa's conduct in the juvenile matter could raise Fifth Amendment issues and would require her attorneys in the juvenile matter to advise her. And if

20

Preciosa asserted the Fifth Amendment, then the defense would have to get witnesses to establish the facts underlying the juvenile petition. The trial court particularly noted that Preciosa was a juvenile and that the events took place after she was shot and after she testified at the preliminary hearing. The trial court therefore excluded the evidence under Evidence Code section 352, finding it would confuse the jury and consume an undue amount of time.

B. *No abuse of discretion*

Because misconduct "involving moral turpitude may suggest a willingness to lie" (*People v. Wheeler* (1992) 4 Cal.4th 284, 295), a witness may be impeached with prior conduct involving moral turpitude even if it did not result in a felony conviction (*People v. Clark* (2011) 52 Cal.4th 856, 931). Misconduct other than a prior conviction "generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude." (*Clark*, at pp. 931–932.) Trial courts have discretion to exclude such evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A trial court's exercise of its broad discretion to admit or to exclude impeachment evidence will ordinarily be upheld on appeal. (*Clark*, at p. 932.)

Gonzalez acknowledges the broad discretion vested in a trial court in ruling on the admissibility of evidence but suggests the trial court here failed to fulfill its duty to know of and to assess the proffered evidence before excluding it. The suggestion

21

is meritless. The trial court held a substantive, in-depth hearing on the issue at which all counsel spoke and the trial court demonstrated its command of the law and essential facts. When the trial court noted that the events giving rise to the juvenile petition occurred *after* the shooting, it was implicitly commenting on the probative value of the evidence. That is, nothing giving rise to the juvenile petition gave Preciosa a direct motive to lie in the current case. And, although Gonzalez now faults the trial court for failing to obtain Preciosa's juvenile file, he does not say what the file would have added to the hearing. Instead, the record unequivocally shows that the trial court complied with its duty to weigh the probative value of the proposed evidence as required by Evidence Code section 352.

Turning to the substantive issue of whether the trial court abused its discretion by excluding the evidence, it did not. Preciosa could not testify about facts underlying the petition without incriminating herself, so other witnesses would have to establish those facts. Those alleged facts included that Preciosa absconded from her suitable placement, stole a car, drove it recklessly, and crashed into another car, killing its passenger. As the trial court found, admitting the evidence would have necessitated a trial within a trial, thereby consuming an undue amount of time, when the defense had ample other impeachment evidence. Preciosa had several times admitted she was a gang member; indeed, a detective described her as an open and proud one. Preciosa also brought her credibility and willingness to lie into question by saying that she had misidentified Gonzalez and had only identified him at the detective's suggestion. Further, Preciosa's behavior at the preliminary hearing did her no favors. Although Gonzalez suggests that the cold reading of that

22

testimony at trial favored the prosecution, to the extent the defense wanted to cast doubt on Preciosa's morality, even the cold reading of her testimony served that purpose.

Finally, Preciosa's juvenile matter concededly spoke to her overall credibility and moral turpitude. But it did not implicate a direct bias or motive to lie in Gonzalez's case. Indeed, as the trial court noted, the events giving rise to the juvenile petition occurred in 2018, after Preciosa had already identified Gonzalez and then recanted at the preliminary hearing. The matters were therefore unconnected. Under these circumstances where the witness has no direct reason to lie in the current case, courts are empowered to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues. (*People v. Wheeler*, *supra*, 4 Cal.4th at p. 296.)

III.    CALCRIM No. 315

Gonzalez challenges the standard jury instruction the trial court gave regarding eyewitness identification testimony, CALCRIM No. 315. The instruction lists factors for the jury to consider in evaluating identification testimony, including "[h]ow certain was the witness when he or she made an identification?" Our California Supreme Court has approved use of CALCRIM No. 315's predecessor instruction, CALJIC No. 2.92, including its certainty factor. (*People v. Sánchez* (2016) 63 Cal.4th 411, 462; *People v. Wright* (1988) 45 Cal.3d 1126, 1144.) But the California Supreme Court is now considering whether instructing a jury that an eyewitness's level of certainty can be considered when evaluating the reliability of the identification per CALCRIM No. 315 violates a defendant's due process rights. (*People v. Lemcke* (June 21, 2018, G054241) [nonpub. opn.] review granted Oct. 10, 2018, S250108.) We express no opinion on the issue and instead

23

merely find that, for now, we are bound by *Sánchez*.[6] (See generally *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

IV.   Cumulative error

Gonzalez asserts that the cumulative effect of the purported errors requires reversal, even if they were individually harmless.  As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1235–1236.)

V.   Sufficiency of the evidence

Gonzalez contends that the evidence was insufficient to support his convictions because the evidence rested on Preciosa's untested and unreliable identification.[7]  We disagree.

A.   *Standard of review*

The standard for determining whether evidence was sufficient to sustain a criminal conviction is well-settled.  We " ' "review the entire record in the light most favorable to the judgment to determine whether it contains substantial

---

[6] The certainty factor was not left unchallenged by the defense expert, who testified that there are case studies in which witnesses 100 percent certain of their identifications were wrong.

[7] Gonzalez makes no direct argument that the photographic lineups were unduly suggestive and should have been excluded under the two-part test described in, for example, *People v. Cunningham* (2001) 25 Cal.4th 926, 989.

24

evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.)  We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*Ibid.*)  Resolution of conflicts and inconsistencies in the testimony of witnesses is in the trier of fact's exclusive province.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  We may not on appeal substitute our judgment for the jury's unless the testimony is so inherently improbable and impossible of belief as to constitute no evidence at all.  (*Ibid.*)  Reversal is unwarranted unless on no hypothesis whatever is there sufficient substantial evidence to support the conviction.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Notwithstanding these well-settled principles, Gonzalez suggests that the standard of review is "tempered" where, first, evidence was withheld from the jury and, second, where the conviction rested primarily on identification evidence.  We have already rejected the first premise on which this suggestion is based, that evidence was improperly withheld from the jury.  Moreover, *In re Sodersten* (2007) 146 Cal.App.4th 1163, which Gonzalez cites, does not support his argument that some different standard of review applies.  In that case, prosecuting and law enforcement authorities knowingly withheld exculpatory evidence.  (*Id.* at pp. 1169, 1224.)  *Sodersten* thus involved error under *Brady v. Maryland* (1963) 373 U.S. 83, 87.  The trial court's rulings here, even if erroneous, do not implicate *Brady*.  *Sodersten* has no relevance to this case or to the appropriate standard of review.  As for Gonzalez's second argument, an uncorroborated out-of-court identification, even though

repudiated, can be sufficient evidence to support a conviction. (*People v. Cuevas* (1995) 12 Cal.4th 252, 270, 276–277; see also *People v. Young*, *supra*, 34 Cal.4th at p. 1181 [single witness's testimony sufficient to support criminal conviction].)

B.    *Sufficiency of the evidence*

Preciosa identified Gonzalez as the shooter.  Gonzalez, however, argues that Preciosa's identification was insufficient because the lineup was administered in a suggestive manner and her identification was equivocal.  In addressing this argument, we begin with the general observation that, notwithstanding Preciosa's unavailability at trial, the defense was able to attack the identification through, for example, cross-examination of the detective who administered the lineups and introduction of the defense expert's testimony.  Therefore, we generally reject Gonzalez's argument to the extent it asks us to reweigh evidence. (See, e.g., *People v. Young*, *supra*, 34 Cal.4th at p. 1181.)

Turning to Gonzalez's specific arguments, he first says that, according to the expert, best practices demand that the person administering a lineup not know who is the suspect.  The jury, however, knew about this alleged problem with the lineup. The jury knew that Mario had already identified Gonzalez by the time the detective showed the lineup to Preciosa.  The jury was also given information to evaluate this fact, as the defense expert had testified that a double-blind lineup is the better practice. The jury was therefore equipped to determine whether the detective suggested to Preciosa that she should select Gonzalez.

Gonzalez's second argument why the lineup was defective is that the "fillers" made him stand out because he was the only person with a three-dot facial tattoo.  And, although no witness said that a suspect had facial hair, some of the "fillers" had facial

hair. Again, the lineups were in evidence, as was the expert's testimony about how "fillers" should be selected to ensure that the witness does not have just one viable choice.[8] The jury was more than capable of deciding whether Gonzalez stood out from the others.

Third, Gonzalez casts suspicion on the detective's behavior when the detective showed the lineup to Preciosa, because her initial identification occurred off-camera. The detective did not start recording Preciosa until about 5 or 15 minutes into his interview of her. The jury was therefore unable to evaluate whether the detective suggested to Preciosa that she should select Gonzalez; hence, the detective's testimony about what happened before he began recording "holds little relevance." As we have said, however, what relevance should be attached to the detective's testimony about what happened before he began recording Preciosa was up to the jury. As for the portion of the interview that was recorded, the jury heard the comments the detective made and could therefore determine whether Preciosa hesitated in making an identification or was pressured to select Gonzalez. Clearly, the jury resolved these issues against Gonzalez.

Turning to Preciosa's identification itself, Gonzalez describes it as "not a strong recognition experience." In

_____

[8] Gonzalez speculates that perhaps Preciosa recognized him from a prior encounter. He apparently bases this on a recorded phone call Gonzalez made to his girlfriend in which she implored him to stop hitting up people on the street and on evidence that Gonzalez hung out on Blythe Street. There was, however, no evidence that Mario or Preciosa had ever encountered Gonzalez before that day.

Preciosa's words, she thought Gonzalez looked "too familiar" and she said he was "the one, either . . . he was the passenger, the shotgun one." But Preciosa also clearly said that he hit her up on the sidewalk and "for sure he was wearing the B hat." She was unequivocal that the man in the B hat was the shooter.

Given this and the standard of review, we cannot say that the evidence was insufficient to support the convictions, even with the conflicts in the evidence, the primary one being that Mario said that the driver got out of the car and shot him, and Preciosa said the passenger got out of the car and shot them.[9] Nothing about these conflicts renders the identifications an impossibility. Such evidentiary conflicts are for the trier of fact to resolve. (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1259.)

Notwithstanding any conflicts in the evidence, Preciosa's testimony did not stand alone in implicating Gonzalez. Preciosa and Mario's testimony aligned in one crucial respect: both placed Gonzalez at the scene of the shooting, albeit in different roles.[10] Mario said that the man who confronted him in the first

---

[9] Other discrepancies included disagreement about the makes of the cars involved in the incidents. For example, Mario thought that the car involved in the second incident was a BMW; Preciosa thought it was a Honda. There were different estimates about the height and age of the male participants, and all witnesses estimated that the shooter was taller than Gonzalez, who is 5 feet 5 inches when wearing shoes.

[10] Preciosa and Mario independently identified Gonzalez, with Mario selecting Gonzalez from 30 photographs.

encounter was the passenger in the car in the second encounter.[11] Mario added that the man who first confronted him wore a Brooklyn Dodgers hat, and the passenger in the second encounter—whom he identified as Gonzalez—also wore a Brooklyn Dodgers hat. And Mario said that the man wearing the Brooklyn Dodgers hat in the first encounter had a gun. Preciosa said that a man wearing a Brooklyn Dodgers hat was the shooter. From this, the jury could have reasonably inferred that because the man involved in the first encounter wore a Brooklyn Dodgers hat and had a gun and because Preciosa testified that the shooter wore a Brooklyn Dodgers hat, the passenger was the shooter, as Preciosa testified. She identified that passenger/shooter as Gonzalez.

In addition to Preciosa and Mario's identifications, other evidence linked Gonzalez to the crimes. There was evidence that Gonzalez was a member of the Blythe Street gang, that Blythe Street gang members wear Brooklyn Dodgers hats, and that Gonzalez was known to wear such a hat. A Brooklyn Dodgers hat was found in Gonzalez's room. This evidence would be insufficient on its own to establish Gonzalez's guilt. But when

---

[11] It makes sense that the man involved in the first encounter also participated in the second encounter. The evidence suggests that the Blythe Street gang members were looking for Mario and Preciosa after they failed to meet up to fight the man and woman. Only someone who engaged in the first exchange of gang challenges could have identified Mario and Preciosa as the people they were seeking.

viewed in context with the identifications, it buttressed them, albeit ever so slightly.

We therefore conclude that the evidence was sufficient to support Gonzalez's conviction of the attempted murders.

VI.     Sentencing errors

Gonzalez raises two purported sentencing errors.

First, the jury found true as to both counts firearm enhancements under section 12022.53, subdivisions (b), (c), (d), and (e)(1).  The trial court imposed sentence on the subdivision (d) enhancement but failed to impose and to stay sentences on the remaining enhancements.  Gonzalez argues that those remaining enhancements must be stricken under Senate Bill No. 620, which added section 12022.53, subdivision (h) and gave trial courts discretion to strike firearm enhancements.  However, that new law was already in effect when the trial court sentenced Gonzalez.  The trial court therefore clearly exercised its discretion *not* to strike the remaining firearm enhancements. Under these circumstances, the trial court, having exercised its discretion to impose the one enhancement, should have imposed and stayed the remaining ones.  (See *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130.)

Second, the trial court imposed two 3-year terms for the great bodily injury enhancements under section 12022.7. However, because the trial court imposed a term under section 12022.53, subdivision (d), it could not also impose a term under

30

section 12022.7.  (§ 12022.53, subd. (f).)  As the People concede, the two 3-year terms must be stricken.

## DISPOSITION

The enhancements under Penal Code section 12022.53, subdivisions (b) and (c) are imposed and stayed as to all counts. The two 3-year terms imposed under Penal Code section 12022.7 are stricken.  The trial court is directed to modify the abstract of judgment and to forward the modified abstract of judgment to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

KALRA, J.*

_____

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31