Filed 12/5/24  P. v. Kelly CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E080897 |
| v. | (Super.Ct.No. FVI22000003) |
| JERRY KELLY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Alexander R. Martinez, Judge.  Affirmed.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Jerry Kelly of forcible rape, forcible oral copulation, kidnapping to commit rape, and simple kidnapping. (Pen. Code, §§ 261, subd. (a)(2), 287, subd. (c)(2)(A), 209, subd. (b)(1), 207; unlabeled statutory citations refer to this code.) As to the rape and oral copulation offenses, the jury found true the special circumstance allegations of aggravated and simple kidnapping under the one strike law. (§ 667.61, subds. (d)(2), (e)(1).) On appeal, Kelly argues that the trial court prejudicially erred by (1) denying his request to call a deputy district attorney to contradict the victim's testimony about what she said during a case meeting and (2) admitting the victim's testimony that Kelly told her that he had been affiliated with gangs. We find no error and therefore affirm.

BACKGROUND

I. *Prosecution's case*

On the evening of December 7, 2019, Jane Doe got into a fight with her boyfriend, and he kicked her out of his house. Doe was homeless at the time, so she called a friend, Dino, to give her a ride to another friend's house. When Dino arrived, he had two other passengers with him and said that he "had to make a stop real quick first." Dino then drove to a rural area of Apple Valley, California, where Kelly and others had set up an encampment of cars and RVs. That evening, Doe remained with the group and smoked methamphetamine from a shared pipe. Doe was a regular methamphetamine user at that time.

2

Doe and Dino spent the night in one of the RVs. The next morning, they had consensual sex, and Dino then left the RV to check on his two other passengers. Soon thereafter, Kelly came into the RV and told Doe that Dino had left to deal with an "emergency." Kelly told Doe that he promised Dino that he would give her a ride later that day.

Doe spent the next several hours with Kelly in a different RV, talking, drinking a small amount of beer, and smoking methamphetamine. Doe testified that Kelly "made himself out to be a violent type of person" by "talking about . . . fighting with people and . . . being from gangs." She also testified that Kelly made statements throughout the day that made her fear that he was going to hold her captive at the encampment. For example, he told her that she had "to stay there in the encampment and . . . do things for people there, take care of people there. And that once I learned how to do everything right and I knew how to act right, I can go see my family then, and he would have to accompany me. He would have to be with me to go see my family."

Sometime around dusk, Kelly told Doe, "Let's go," and they got into a white car that was parked about 10 to 12 feet away from the RV. Kelly started the engine but quickly turned it off, saying that he was not going to take Doe anywhere until she "made him come." Doe responded that she really needed to get back to her son. Kelly got out of the car, opened the passenger side door, pulled Doe out by her arm, and pushed her toward the RV.

3

Doe testified that she did not want to go back inside the RV but went in anyway because Kelly was "right behind [her]." She testified that she was afraid of Kelly because of his size (he was six feet tall and weighed 250 pounds; Doe was five feet five inches and weighed 150 pounds), because he had just pulled her out of the car, and because of the comments about violence that he had made earlier in the day. As she reentered the RV, she thought, "I [am] never going to see my kids again."

Inside the RV, Kelly told Doe that she had to "make him come," and she replied, "If you fuck me, it's going to be rape." Kelly took her clothes off, forced her to have oral and vaginal sex, and slapped her face and buttocks. Because she was afraid of Kelly, she did not fight back or yell for help.

During the assault, a loud noise came from outside, and Kelly left the RV to investigate. Doe took the opportunity to try to escape, dressing quickly and slipping through the door. Although she had trouble seeing in the dark, she noticed a dirt road nearby. She did not know where the encampment was located or in which direction she should travel, but when she heard Kelly's voice calling after her, she headed away from the sound. When Doe saw the lights of Kelly's car, she hid in the brush that bordered the road. Kelly yelled that Doe was his wife, and he asked why she was leaving their home. Kelly said that he would take Doe home, but "something told [her] don't go back."

Kelly eventually gave up his search, and Doe found her way back to the road. After trying unsuccessfully to hitchhike, she noticed building lights in the distance and walked toward them, ending up at a Walmart distribution center where she made contact

4

with two employees. The employees testified that Doe appeared "extremely upset" and "scared" and told them that she had been "held against her will" and had "escaped and ran towards the lights."

The employees called the police, who interviewed Doe and took her to a hospital for a forensic examination. Doe told the examining nurse that Kelly had pulled her out of his car and raped her. Doe said that he slapped her, put his penis in her mouth and vagina, tried to put his penis in her anus, and used his saliva as lubricant. Doe reported that she was experiencing pain in her right arm from being pulled out of the car. She also reported that, earlier in the day, she had consensual sex with another man, drank beer, and smoked methamphetamine. The nurse did not observe any signs of use, such as dilated pupils or rapid speech. Doe's heart rate, blood pressure, and temperature were in the normal range. The nurse observed that Doe had bruising on her left arm, bruising and abrasions on her right arm, bruising on her left leg, and abrasions on her labia. The nurse collected DNA samples from Doe's genitals, and the criminalist who analyzed the samples found a match for Kelly's DNA in the non-sperm DNA collected from Doe's mons vulva.[1]

When cross-examining Doe, defense counsel questioned her extensively about her prior statements to the police and her testimony at the preliminary hearing in order to show that her descriptions of the incident contained discrepancies. For example, defense

---

[1] The mons vulva is the area between the abdomen and the vulva and is considered the "top of the genital area." The criminalist testified that it was 1.7 quadrillion times more likely that the DNA collected from Doe's mons vulva belonged to Kelly than to any other individual.

counsel highlighted the fact that Doe testified at the preliminary hearing that Kelly made the statement about Doe making him "come" only once (inside the RV), whereas at trial she testified that Kelly made the statement twice (inside the car and again inside the RV). Defense counsel also highlighted the fact that Doe did not tell police that Kelly pushed her toward the RV after pulling her out of the car. When defense counsel asked Doe to admit that the first time she mentioned the push was at the preliminary hearing, Doe said that she had mentioned the push before the preliminary hearing, during a meeting with the deputy district attorney initially assigned to her case.

Doe became emotional in response to defense counsel's various impeachment attempts, and she repeatedly testified that she could not remember the details of her prior statements. Doe said that it was especially difficult to remember her statements to the police on the evening of the incident, because she was "very upset" that night. At one point, Doe became frustrated with what she perceived as nitpicking from defense counsel and expressed her intention to leave the stand, but the court persuaded her to take a break instead.

II.    *Defense's case*

A sheriff's deputy who investigated the incident testified that although he remembered inspecting the encampment and interviewing someone there, he could not recall the details of his investigation. He also said that the deputy who had accompanied him to the encampment and prepared the police report had moved out of state.

6

A forensic toxicologist testified that the urine sample that Doe provided at the hospital approximately six hours after the incident tested positive for methamphetamine and that methamphetamine can be detected in urine for up to 12 hours after use. The toxicologist also testified that common side effects of chronic methamphetamine use include hallucinations, delusions, and paranoia.

Because Doe testified that she could not remember her prior statements to police or much of her preliminary hearing testimony, the court allowed defense counsel to introduce the audio recording of her police interview and portions of her preliminary hearing testimony into evidence. Although some details in her prior statements were different from her trial testimony, Doe's prior statements describing the assault were largely consistent with her trial testimony.

To impeach Doe's testimony that she mentioned the push in a meeting that took place before the preliminary hearing, defense counsel called Hanes, Doe's victim advocate, as a witness. Hanes testified that she was present at the meeting and did not recall Doe describing any case-specific facts.

III. *Verdict and sentencing*

The jury found Kelly guilty of forcible rape, forcible oral copulation, kidnapping to commit rape, and simple kidnapping (a lesser included offense of kidnapping to commit oral copulation). (§§ 261, subd. (a)(2), 287, subd. (c)(2)(A), 209, subd. (b)(1), 207.) As to the rape and oral copulation counts, the jury found true special circumstance allegations of aggravated and simple kidnapping. (§ 667.61, subds. (d)(2), (e)(1).)

7

Following a bench trial, the court found that Kelly suffered two prior convictions that qualified as strikes under the three strikes law and as prior serious felonies under section 667, subdivision (a)(1). (§§667, subds. (a)(1), (b)-(i), 1170.12, subds. (a)-(d).) The court sentenced Kelly to a total of 170 years to life in prison.

DISCUSSION

I.      *Denial of Kelly's request to call an additional impeachment witness*

Before trial, Kelly sought to call both Hanes (the victim advocate) and Cimino (the deputy district attorney initially assigned to the case) to impeach Doe's testimony that she mentioned the push during a meeting that occurred before the preliminary hearing. The trial court initially ruled that both witnesses could testify. However, upon learning that Hanes was present for the entire meeting and that Cimino never had any private conversations with Doe, the court ruled that Hanes's testimony would be sufficient, and the court denied the request to call Cimino. Kelly contends that was prejudicial error. We disagree.

     A.      *Additional background*

          1.      *Doe's statements to the police*

In her police interview, which was played for the jury, Doe told the deputy that Kelly was supposed to give her a ride out of the encampment but ended up raping her inside one of the RVs. Doe provided the following description of what happened when she was in the car with Kelly: "[He] said no [inaudible] I forgot what he said, but he said no something and then he got out the car, he opened my door and he, like, tried to pull me

8

out. . . . And I was telling him no I wanna go home to my son. I need to check my son. . . . He wouldn't let me. He would [crying] [inaudible]. And then at one point we were back in the RV." Later in the interview, Doe clarified that Kelly had pulled her out of the car by her arm, and she said that it was possible that Kelly had injured her by doing so. Doe did not state that Kelly pushed her.

On the basis of Doe's statements during the police interview and the forensic examination, the People initially charged Kelly with one count of forcible rape and one count of forcible oral copulation.

### 2. *Doe's preliminary hearing testimony*

At the preliminary hearing, Doe testified that after Kelly pulled her out of the car, he either pushed or pulled her toward the RV. She said that Kelly "came around the car and pulled the door open and proceeded to pull me out the car, pull me towards the RV." When asked to clarify what happened after Kelly opened the car door, she said that he "basically, just had to like push, push me in [the RV]. I didn't want to go in. I wanted to go home."

During cross-examination, defense counsel asked Doe to admit that this was her first time reporting that Kelly forced her into the RV. The following exchange occurred:

Q. [For t]he first time today you [are] saying that you were pulled out of the car and forced back into the RV, correct?

A. No.

Q. So you told officers you were forced into the RV?

9

A. I don't recall saying if I was forced or not.

Q. So then this is the first time you're saying it, correct?

A. No.

Q. So you don't recall if you told officers that you were forced into the RV?

A. This is not the first time I've said that I was forced into the RV.

Q. You don't—

A. Whether I said to the officers or not, I do not know.

Q. Did you tell the DA before you testified today that you were forced into the RV?

A. Yes.

Q. So you had a conversation with the DA prior to your testimony?

A. There was a previous DA, a female.

Q. And you had a conversation with that DA?

A. Yes. I had a conversation with that DA. I believe I told [the current prosecutor also but] I cannot recall if I did or not.

At that point, defense counsel objected that she was entitled to disclosure of Doe's prior conversations with the deputy district attorney. The prosecutor responded that he was unaware of any such conversations and that Doe's testimony about being pushed came as a surprise to him as well. In response to follow-up questions from defense counsel, Doe testified that the meeting occurred a few months after the incident and that her victim advocate, Hanes, was present.

10

After the preliminary hearing, the district attorney amended the charges against Kelly to add the two aggravated kidnapping counts and the one strike allegations of aggravated and simple kidnapping.

### 3.  *The court's in limine ruling*

Kelly moved in limine to call Hanes and Cimino as impeachment witnesses.  As an offer of proof, defense counsel told the court that the prosecutor had spoken with the potential witnesses and both would testify that Doe did not mention any facts of the case at the meeting.  The prosecutor argued that the issue was collateral and that the probative value of the impeachment testimony was slight, because it could "simply be that [Doe] is mistaken" and was "[mis]remembering whether she had previously told someone this fact or not."  The court granted Kelly's request to call both witnesses, reasoning that there was "some marginal relevance" to Doe's credibility in having both witnesses contradict her testimony that she told them about being pushed by Kelly.

### 4.  *The court's modified ruling*

During cross-examination of Doe, defense counsel elicited testimony about the case meeting with Cimino.  Defense counsel asked Doe if she recalled testifying at the preliminary hearing that she told Cimino during a meeting that Kelly had pushed her. When Doe responded that she could not remember, defense counsel refreshed her recollection by having her read the relevant portion of the preliminary hearing transcript. After reading the transcript, Doe said, "Yes, it says I did say something about it, which I agree to.  I did say something about it."

11

After the People rested, the prosecutor asked the court to reconsider its ruling that Kelly could call both witnesses for impeachment. The prosecutor argued that Hanes's testimony would be sufficient to contradict Doe's account of the meeting, because Hanes was present for the entire meeting and therefore could testify to what Doe said. The court asked the prosecutor whether there had been any conversations between Doe and Cimino outside of Hanes's presence, and the prosecutor said that he had confirmed with Cimino that there were no such conversations. The prosecutor also read to the court the portion of the preliminary hearing transcript in which Doe testified that Hanes was present for the entire meeting. The court told the parties that its in limine ruling had been based on the assumption that Doe had a private conversation with Cimino that Hanes had not witnessed. The court modified its prior ruling, concluding that Cimino's testimony would be unnecessarily cumulative and that the court would permit the defense to call only Hanes.

5.    *Hanes's testimony*

Called as a witness by the defense, Hanes testified that she had been a victim advocate since 2005 and that part of her job was to accompany victims to meetings with the prosecution. She said that she was present for the meeting with Cimino that Doe referred to in her testimony. Defense counsel asked if Doe had made any "statements of case facts" during the meeting, and Hanes responded, "[n]ot that I recall." Defense counsel then asked if Doe had mentioned being pushed by Kelly, and Hanes responded, "to be honest with you, I don't have memory of things that were said two years ago."

12

Hanes explained that she did not think the facts of the case would have come up during a case meeting, which was intended to cover procedural matters only. She said that if any case-specific facts had come up during the meeting, she would have made a note of it and given it to the district attorney, and she did not recall having done so in this case.

After Hanes testified, defense counsel asked the court to reconsider its modified ruling, arguing that Cimino's testimony would not be cumulative because "Ms. Hanes testified that she really had no memory or recollection" of the meeting. The court denied counsel's request. The court stated that the police interview that was played for the jury revealed that Doe's statement at the preliminary hearing that Kelly pushed her was not the "bombshell" defense counsel was making it out to be. The court pointed out that Doe had described to the deputy "being physically taken or pulled out of [Kelly's] car back to the RV." Defense counsel responded that there were two separate acts—the pull from the car and the push toward the RV—and that it was Doe's testimony about the push that was the surprise. The court concluded that Cimino's testimony was not "important or relevant" regardless of whether Doe had mentioned the push during her police interview.

B.     *Analysis*

Kelly argues that the court's denial of his request to call Cimino as an impeachment witness constitutes an abuse of discretion under Evidence Code section 352 and a violation of his "constitutional rights to confront the witnesses against him, present a defense, and to due process of law." We disagree.

13

Only relevant evidence is admissible (Evid. Code, § 351), and evidence that bears on "the credibility of a witness" is relevant (*id.*, § 210). However, like any other relevant evidence, impeachment evidence is excludable under Evidence Code section 352 if its probative value is substantially outweighed by the risk that the evidence will necessitate undue consumption of time, confuse the issues, mislead the jury, or create undue prejudice. (Evid. Code, § 352; see also *People v. Ayala* (2000) 23 Cal.4th 225, 301 ["'[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad'"].)

We review the trial court's ruling for abuse of discretion. (*People v. Brady* (2010) 50 Cal.4th 547, 558.) A trial court does not abuse its discretion unless it "'exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice.'" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1180, abrogated on another ground by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Kelly argues that Cimino's testimony would have been highly probative concerning Doe's credibility, because Cimino was the "singular witness who could directly impeach [Doe's] credibility about being forcibly moved into the RV, which was an essential element of the newly filed kidnapping charges." We disagree on both points. Cimino would not have directly impeached Doe's account of the incident, and Doe's testimony about being pushed was not essential to the kidnapping charges.

14

First, Cimino would not have directly impeached Doe's credibility about whether Kelly had in fact pushed her. According to defense counsel's offer of proof, Cimino's testimony would have contradicted Doe's statement that Doe told Cimino during a case meeting that Kelly pushed her. Such testimony has a tendency to disprove Doe's description of what happened during the meeting, but it has no tendency to disprove her description of the incident or discredit her claim that Kelly pushed her. For example, Doe may have failed to mention at the meeting that Kelly pushed her because at the meeting Doe did not describe any of the facts of the incident at all. That is what Hanes testified—the meeting concerned procedural matters, and the facts of the case were not discussed at all. If that is correct, then Doe's failure to mention the push at the meeting has no tendency to disprove her claim that Kelly pushed her.

Second, Doe's testimony that Kelly pushed her was not essential to proving the kidnapping charges. The asportation element of kidnapping requires proof that the defendant moved the victim, or made the victim move, a substantial distance by use of force "or by any other means of instilling fear." (§§ 207, 209, subd. (b); CALCRIM Nos. 1203, 1206.) Doe testified that although she feared that she would never see her children again if she did, she went back inside the RV because Kelly was right behind her and she was afraid of him. Doe also explained for the jury why she was afraid of Kelly. She cited his size, his comments about violence earlier in the day, and the fact that he had used force against her to pull her out of the car. From all of that evidence, the jury could infer that Doe went back inside the RV not because Kelly physically moved her there but

15

because she was afraid of how Kelly would react if she refused to comply with his command that she "ma[k]e him come." Thus, even without the testimony that Kelly pushed Doe, the record contained sufficient evidence for the jury to conclude that the People proved the asportation element of kidnapping.

At most, Cimino's testimony would have disproved Doe's claim that she mentioned the push in a meeting before the preliminary hearing. But whether Doe mentioned the push in that meeting has no "logical bearing on any material, disputed issue" in the case, and it is therefore a collateral issue. (*People v. Contreras* (2013) 58 Cal.4th 123, 152.) "[T]he trial court has wide latitude under state law to exclude evidence offered for impeachment that is collateral." (*Ibid*.) "A fact may bear on the credibility of a witness and still be collateral to the case." (*Id.* at p. 152; see e.g., *People v. Rodriguez* (1999) 20 Cal.4th 1, 9; *People v. Dement* (2011) 53 Cal.4th 1, 50-52.)

Cimino's testimony was relevant only as impeachment on a collateral issue. The testimony would have contradicted Doe's testimony about having mentioned the push before the preliminary hearing, and it therefore supported an inference that she was lying. (See *People v. Lavergne* (1971) 4 Cal.3d 735, 742 (*Lavergne*) [evidence that contradicts a witness's testimony is relevant to the witness's credibility].) However, as the trial court correctly observed, the probative value of Cimino's testimony on that collateral issue would have been slight, for three reasons. First, the testimony would have been cumulative, because Hanes was present for the entire meeting and testified that she had

16

no recollection of Doe mentioning the push. Thus, even without Cimino's testimony, the jurors could reasonably infer from the evidence that Doe was testifying untruthfully when she said that she mentioned the push during the meeting.

Second, although Cimino's testimony could support the inference that Doe was lying about the collateral issue, it could also support the inference that Doe had simply misremembered what she said at the meeting. Such an inference would have been reasonable, given Doe's repeated testimony that she had trouble recalling what she said about the incident on prior occasions. For that reason, Kelly's contention that Cimino might have had a better recollection of the meeting than Hanes carries little force. Even if we assume that Cimino would have testified that she was certain that Doe did not mention the push during the meeting, her certainty speaks only to whether Doe's testimony was accurate, not to whether Doe was lying or merely mistaken.

Third, because the issue is collateral, the jury could conclude that Doe was lying about what she said at the meeting but still believe her account of the assault. "A witness may have a strong reason to lie about the collateral fact which reason would furnish no motive to lie in [her] other testimony." (*Lavergne*, *supra*, 4 Cal.3d at p. 743.) On this record, the jury could reasonably conclude that Doe lied about what happened at the meeting not because she was fabricating her description of the incident but because she was frustrated with defense counsel's line of questioning and wanted to thwart counsel's attempts to portray her as an unreliable witness.

17

Thus, because Cimino's testimony would have been cumulative impeachment evidence on a collateral issue, and because the probative value of her testimony to assess Doe's truthfulness was low, the trial court did not abuse its discretion by denying Kelly's request to call Cimino as a witness. And given our conclusion that the court properly exercised its discretion under Evidence Code section 352, Kelly's claim that the ruling violated his constitutional rights necessarily fails. "[T]he routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957.)

Moreover, even if Kelly could demonstrate that the ruling violated his constitutional rights, the error would be harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Contrary to Kelly's characterization, the prosecution's case was strong. Doe's account of the incident remained consistent throughout the proceedings and was corroborated by physical evidence. She suffered injuries that were consistent with her description of the assault, and DNA matching Kelly's was found on her upper genital area. Kelly makes much of the fact that Doe did not tell police that he pushed her after pulling her out of his car, but defense counsel demonstrated that fact to the jurors, and they still found Kelly guilty as charged. Indeed, defense counsel subjected Doe to a significant amount of cross-examination and pointed out various discrepancies between her trial testimony, on the one hand, and her police interview and preliminary hearing testimony, on the other, but the jury still found her credible. Under these circumstances, we are persuaded beyond a reasonable doubt that

18

the jury would still have convicted Kelly of the kidnapping charges if one more witness had contradicted Doe's testimony about the meeting. (See *People v. Byron* (2009) 170 Cal.App.4th 657, 676 [exclusion of impeachment testimony was harmless beyond a reasonable doubt because the testimony was cumulative and the prosecution's case was strong].)

II.     *Admission of Kelly's comment about "being from gangs"*

Before trial, Kelly moved to prohibit Doe from testifying that he told her that he used to be in a gang. Defense counsel argued that Kelly's gang comment was irrelevant because none of the charges were gang-related, and even if the comment were relevant, it was more prejudicial than probative under Evidence Code section 352. The trial court denied the motion, concluding that the gang comment was highly probative of Doe's fear.

During trial, Doe testified that when she and Kelly were hanging out in the RV during the day, Kelly "made himself out to be a violent type of person" by "talking about . . . fighting people and . . . being from gangs." The prosecutor followed up by asking, "To be very clear, [Kelly] told you . . . about beating people up and previously being part of a gang?" Doe responded, "Yes." During closing argument, the prosecutor briefly referred to Kelly's gang comment twice as evidence of Doe's fear.

On appeal, Kelly argues that the admission of his gang comment was unduly prejudicial under Evidence Code section 352 and violated his constitutional right to due process. We disagree.

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31 (*Chhoun*).) "Evidence of the defendant's gang affiliation . . . can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt." (*Ibid.*) "Even when it is relevant, however, 'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged."'" (*Ibid.*) "'The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.'" (*People v. Montes* (2014) 58 Cal.4th 809, 859.)

The court did not abuse its discretion by admitting Doe's testimony relaying Kelly's gang comment, because the testimony was highly probative of guilt and carried only a slight risk of causing undue prejudice. All of the offenses that Kelly was charged with required proof that he overcame Doe's will by means of force or fear. (§§ 261, subd. (a)(2), 287, subds. (a), (c)(2)(A), 207, 209, subd. (b).) Doe's testimony that Kelly told her that he had been affiliated with gangs was directly relevant to establishing her fear. Moreover, the testimony was highly probative of Doe's state of mind because it was evidence of Kelly's conduct during the incident. Kelly argues that it is "immediately apparent" from the record that his gang comment was not intended to "ensure [Doe's] compliance during the commission of his assault on her," because he made the comment

20

hours earlier, when they were just hanging out and talking.  But his out-of-court statement was admitted to prove Doe's state of mind, not his intent to commit the charged offenses.  (See *People v. Mendoza* (2000) 24 Cal.4th 130, 178-179 [robbery victim's testimony that she understood the defendant to have made a gang-related comment during the incident tended to prove her "state of mind" and was thus "directly relevant to establishing the element of fear"].)

When compared to its probative value, the testimony's potential to cause undue prejudice was slight.  The testimony was brief, and it was also vague in that it did not identify any specific gang or gang activity.  And, contrary to Kelly's claim, the People did not focus on the gang comment during trial.  The prosecutor made no attempt to try to argue or prove that Kelly had in fact been a member of a gang, and the prosecutor's two references to the gang comment in closing argument were brief and limited to the issue of Doe's fear.  Thus, as was the case in *Chhoun*, the gang-related evidence in this case "was brief and unelaborated and was not more inflammatory than the [violent charged crimes]."  (*Chhoun*, *supra*, 11 Cal.5th at p. 33.)

Kelly argues that the testimony should have been excluded as cumulative, because other evidence proved that Doe was afraid of him.  We are not persuaded.  The court may exclude cumulative evidence under Evidence Code section 352 on the ground that it "will necessitate undue consumption of time."  (*People v. Burgener* (1986) 41 Cal.3d 505, 525, disapproved on another ground by *People v. Reyes* (1998) 19 Cal.4th 743, 756.)  But Doe's testimony relaying Kelly's gang comment consumed less than a page in the

21

reporter's transcript, so the trial court did not abuse its discretion by determining that the testimony would consume very little trial time.

Kelly's attempt to compare Doe's testimony to the cumulative gang-related evidence in *People v. Cardenas* (1982) 31 Cal.3d 897 fails. In *Cardenas*, the issue was the identity of the perpetrator. (*Id.* at p. 901.) The testimony was "sharply conflicting" and contained many discrepancies, and the defendant had an alibi. (*Id.* at pp. 901-903.) The prosecutor attacked the credibility of the defendant's alibi witnesses by eliciting testimony that the defendant and the witnesses were all members of the El Monte Flores gang. (*Id.* at p. 903.) The prosecutor asked the alibi witnesses several questions about their gang affiliation and gang practices. (*Id.* at pp. 904-905.) The *Cardenas* court held that the gang-related evidence was unduly prejudicial under Evidence Code section 352 because it was offered only to establish the witnesses' bias and other evidence already showed that they had strong ties with the defendant. (*Id.* at p. 904.) *Cardenas* is distinguishable because the gang evidence here came from Kelly's own out-of-court statement and was directly relevant to proving the charged offenses. Moreover, unlike in *Cardenas*, the prosecutor did not introduce any evidence to prove that Kelly had in fact been affiliated with any gangs.

For all of these reasons, the court did not abuse its discretion by admitting the testimony. And "[b]ecause the court did not abuse its discretion under state law," Kelly's "constitutional claims also fail." (*Chhoun*, *supra*, 11 Cal.5th at p. 26.)

22

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.